Filed 2/13/26  Micheli v. City of Fresno CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| KAREN MICHELI et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF FRESNO, <br><br> Defendant and Appellant. | F085599 <br><br> (Super. Ct. No. 16CECG02937) |
| JACKIE FLANNERY et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF FRESNO, <br><br> Defendant and Appellant. | (Super. Ct. No. 17CECG01724) <br><br> **OPINION** |

APPEAL from a judgment of the Superior Court of Fresno County.  Rosemary T. McGuire, Judge.

Boucher, Raymond P. Boucher, Shehnaz M. Bhujwala; Chandler Law, Stuart R. Chandler; Cotchett, Pitre & McCarthy, Frank M. Pitre, Julie L. Fieber, Donald J. Magilligan; Kabateck, Brian S. Kabateck; Law Office of Michael E. Gatto, Michael E.

Gatto; Owen, Patterson & Owen, Gregory J. Owen; Esner, Chang, Boyer & Murphy, Andrew N. Chang, Stuart B. Esner and Rowena J. Dizon for Micheli and Flannery Class Plaintiffs and Appellants.

Aleshire & Wynder, Anthony R. Taylor, Christine M. Carson, Michael C. Huston; Tropea McMillan, Matthew D. McMillin; Andrew N. Janz and Tina R. Griffin for Defendant and Appellant.

-ooOoo-

In this consolidated class action suit, plaintiffs/appellants (plaintiffs)[1] appeal from a final judgment entered in favor of defendant/appellant City of Fresno (City) after the trial court granted City's motion for summary judgment, and from an earlier court order sustaining City's demurrer to plaintiffs' cause of action for inverse condemnation without leave to amend. City filed a protective notice of cross-appeal to challenge the court's previous class certification order.

We reverse the judgment and direct the superior court to vacate its order granting summary judgment and to enter a new order granting summary adjudication of plaintiffs' class certified causes of action for breach of contract and breach of implied warranty and denying the remainder of the motion. In addition, we reverse the court's order sustaining City's demurrer to plaintiffs' inverse condemnation claim without leave to amend and direct

---

[1]     Plaintiffs in the lead action (case No. 16CECG02937) are Karen Micheli, individually and as Trustee of the Michael Micheli and Karen Micheli Trust; Michael Micheli, individually and as Trustee of the Michael Micheli and Karen Micheli Trust; Faith Nitschke, individually and as Trustee of the Nitschke Family Trust of 2000; David Nitschke, individually and as Trustee of the Nitschke Family Trust of 2000; and Jeanette Grider.

Plaintiffs in the consolidated action (case No. 17CECG01724) are Jackie Flannery; Guadalupe Meza; Ronda Rafidi; Shann Hogue (nee Shann Conner); Marirose Larkins; Patricia Wallace-Rixman aka Patty Wallace-Rixman; Harry Rixman; and Kelly Unruh, individually and as Trustee of the Kelly D. Unruh Living Trust.

We are advised by plaintiffs' counsel that plaintiff Harry Rixman passed away after the entry of judgment.

it to enter a new order sustaining the demurrer with leave to amend. We affirm the court's class certification order.

## INTRODUCTION

City, through its Water Division, operates a large public water system to supply its constituents with drinking water. For most of its history, the drinking water City supplied to its customers was sourced from natural groundwater reserves. Over the years, this groundwater resource has been receding. In 1991, City "formed a technical advisory committee with other local agencies" to develop a plan "to ensure the Fresno metropolitan area has a reliable water supply through 2050." Pursuant to the plan, City commissioned the development of the Northeast Surface Water Treatment Facility [NE treatment facility] to treat surface water (e.g., water obtained from lakes, reservoirs, rivers and/or canals) for use as drinking water.

City began operating the NE treatment facility in 2004 upon receiving interim approval from the California Department of Health Services (DHS) to use the Enterprise Canal as a source of raw water supply for the facility. DHS (and a successor entity, the State Water Resources Control Board (State Board)) subsequently issued amendments to City's water supply permit to govern its continued operation of the NE treatment facility.

Plaintiffs, residents of northeast Fresno, allege the water City supplied them from the NE treatment facility caused their galvanized iron plumbing to corrode to the point of requiring replacement and to leach harmful contaminants into their drinking water, resulting in recurring discolored water episodes and causing them health-related concerns.

Plaintiffs brought suit against City alleging, among other things, claims for inverse condemnation, nuisance and negligence.

## FACTUAL AND PROCEDURAL BACKGROUND

We begin our review by summarizing facts and contentions alleged in plaintiffs' fourth amended complaint, which was the subject of City's demurrer to plaintiffs' inverse condemnation claim.

3.

## I.     Allegations of the Fourth Amended Complaint

In their fourth amended complaint, plaintiffs make the prefatory statement that "[a]ll allegations … are pled in the alternative to the extent they present any actual conflict."  The facts alleged by plaintiffs are assumed true for the purpose of reviewing the trial court's order sustaining City's demurrer.  (*Potocki v. Wells Fargo Bank, N.A.* (2019) 38 Cal.App.5th 566, 569.)

Prior to the events at issue, City "relied exclusively on groundwater … to supply its residents with potable water."  City eventually "saw a need to develop an additional source of water to supply homes in the City of Fresno."  As a result, in 2004, City brought the NE treatment facility online, at which point City began using surface water sourced from local rivers to supplement its water supply, treated the blended water at the NE treatment facility, and supplied "more than 20 million gallons of water per day to thousands of homes" in northeast Fresno.

After the NE treatment facility was brought into service, northeast Fresno residents (service area residents), including plaintiffs and class members, "began experiencing issues with their water, including discoloration."  City began to receive water quality complaints from residents who had not previously experienced such problems.

City "was aware that these issues would likely manifest at the time it undertook to build and develop" the NE treatment facility as a result of a 1998 engineering report it commissioned.  City knew that " 'galvanized piping predominates with well over 50% of the installation in Fresno households.' "  "The 1998 report informed the CITY that there would be a strong likelihood of corrosion in galvanized piping due to the significant differences in these water sources' inorganic character."  City's consultants advised it that changing its water source to blended groundwater and surface water would lead to "degradation in the water's aesthetic quality" and that "water quality issues may manifest in the form of increased release of particulates, red water episodes, and the increased corrosion on the base metal of the piping's wall."  City knew the new water would "destabiliz[e] the

material built up in the pipes in most of the [service area] residents' homes," would cause corrosion leading to "the leaching of metals, including toxic metals …, into the water that Fresno residents drink," and would necessitate residents replace their galvanized pipes.

City, in order to supply sufficient water to the entire City of Fresno, "took a calculated risk that damage might occur to some residents' properties with galvanized pipe." The "highly aggressive and corrosive water" from the NE treatment facility caused plaintiffs and class members' plumbing to corrode and leach toxic metals into their drinking water. "City has continually denied responsibility for issues relating to the water supply it delivers and claims that the water is not defective or harmful to people or property."

In the several months prior to January 2016, water quality complaints increased. As a result, in 2016, after receiving complaints from over 300 service area residents, City "publicly disclosed the issue and undertook an investigation." Although City had been receiving such complaints for years prior to its investigation, it denied previous knowledge of the issue.

As part of its investigation, City consultants tested the water in numerous service area resident homes (including those of plaintiffs), analyzed the test results, and examined extracted pipes from affected homes. The results "revealed corrosive damage to Plaintiffs' plumbing and the presence of lead, iron, and other toxic contaminants at levels in excess of allowable [drinking water] limits." In some instances, the test results revealed lead levels that exceeded the Environmental Protection Agency's (EPA) action level standard.[2]

---

[2]  " 'In 1991, the EPA promulgated the National Primary Drinking Water Regulations for Lead and Copper[.] [Citation.] … Lead and copper enter drinking water primarily through corrosion of service and plumbing lines and plumbing materials. [Citations.] To determine the corrosivity of drinking water, the [LCR] requires routine monitoring at kitchen or bathroom taps of residences and other buildings based on so-called "action levels" … established by the EPA." (*Williams v. Moulton Niguel Water Dist.* (2018) 22 Cal.App.5th 1198, 1203 (*Williams*).) " 'An [action level] exceedance is not a violation of the [Lead and Copper Rule], but rather, may trigger other requirements that include water quality parameter monitoring, corrosion control treatment, source water monitoring[ and ] treatment, public education, and lead service line replacement.' " (*Id*. at p. 1204.)

City's consultants determined the "probable cause of [water] discoloration … and corrosion in [plaintiffs'] galvanized piping was [City's] addition of treated surface water into the water distribution system that previously relied solely on groundwater." The problem was exacerbated by City's decision to switch back and forth between groundwater and surface water. The consultants "acknowledged that the discoloration issue will not be completely eliminated so long as the [NE treatment facility] continues supplying water to homes with galvanized piping." They recommended City advise service area residents to "let the water run" before using to reduce lead concentrations, and to replace their galvanized piping.

City's "maintenance and operation of its [NE treatment facility] relating to the function and purpose of the plant as conceived, including but not limited to the introduction of the surface water to the existing groundwater system without appropriate treatment to address the changing chemistry and its impact to Fresno's water supply, … caused it to deliver highly aggressive and corrosive water" to plaintiffs' homes. The "introduction of treated surface water into Fresno's water supply as deliberately designed and conceived by the [City] caused physical damage to Plaintiffs' and Class members' properties."

A report prepared by City consultants as part of City's 2016 investigation concluded City's "change in water sources caused a disturbance in the chemical balance between the water and the piping surfaces. This disturbance only intensified with [City's] deliberate act of continuously switching the two chemically different water sources back and forth based on consumer demand, which prevented the surface piping from being able to establish a balance with either water source[]."

In an allegation that was *not* incorporated into plaintiffs' inverse condemnation cause of action, plaintiffs allege City failed "to comply with the [applicable] regulatory scheme, which includes legislatively mandated water testing, notification, and reporting requirements" including federal and state Lead and Copper Rules (sometimes collectively

6.

referred to as "LCR") (40 C.F.R. § 141.80 et seq.; Cal. Code Regs., tit. 22, § 64670 et seq.)[3] and "fail[ed] to comply with California's Safe Drinking Water Act" (state SDWA) (Health & Saf. Code, § 116270 et seq.)[4] "and its implementing regulations, including but not limited to" subdivision (a) of section 116550 "by failing to operate the [NE treatment facility] with State-mandated corrosion control treatment in violation of its water permit, failing to rigorously control the pH levels of its water, and by modifying its corrosion control treatment without approval from" the State Board.

City did not "report the results of tests revealing contaminated and discolored water … to the State … or take sufficient system-wide measures to remedy the problem in order to mitigate or prevent further damages to its residents and their properties" and ignored "irrefutable evidence, before January 2016" that the water supplied to service area residents was unsafe, not potable and exposed service area residents to toxic metals, property damage, and serious health risks.

City "concealed [its] wrongdoing through misrepresentations and omissions." As a result, plaintiffs were led to believe their plumbing was the source of their water problems and that the water was safe for all purposes. Plaintiffs regularly drank and used their water for normal household purposes unaware of the risks it posed. Plaintiffs contend any applicable limitation periods that might otherwise bar suit should be equitably tolled due to City's concealments and misrepresentations to service area residents about the water quality and that they exercised due diligence to discover City's wrongdoing and facts giving rise to their claim but could not reasonably discover them prior to filing suit.

---

[3]     All further references to state regulations are to title 22 of the California Code of Regulations, unless otherwise noted, and are denoted by the term "State Regulation" followed by the section number of the regulation.

All further references to federal regulations are to title 40 of the Code of Federal Regulations, unless otherwise noted, and are denoted by the term "Federal Regulation" followed by the part number of the regulation.

[4]     All further statutory references are to the Health and Safety Code unless otherwise noted.

Plaintiffs allege their injuries include, without limitation, "damaged pipes and plumbing, diminished property values, the cost of remediation and re-plumbing, [and] the cost of contaminated water."

## II.   Procedural Background

On September 9, 2016, plaintiffs in the lead action (case No. 16CECG02937) filed suit against City.  On May 17, 2017, plaintiffs in the consolidated action (case No. 17CECG01724) filed suit against City.

In 2020, plaintiffs filed their fourth amended complaint alleging causes of action for inverse condemnation, negligence, nuisance, breach of contract, unjust enrichment, and breach of implied warranty.  City demurred to the entire fourth amended complaint and to the causes of action and class action allegations contained therein.  On February 26, 2021, the trial court sustained the demurrer to plaintiffs' cause of action for inverse condemnation without leave to amend, sustained the demurrer to plaintiffs' cause of action for unjust enrichment with leave to amend, and otherwise overruled City's demurrer.

In March 2021, plaintiffs filed their fifth amended complaint (governing complaint) for negligence, nuisance, breach of contract, unjust enrichment, and breach of implied warranty.  Plaintiffs subsequently dismissed their cause of action for unjust enrichment without prejudice.

On July 30, 2021, the trial court granted plaintiffs' motion to certify the class action. On August 2, 2021, the court issued its "Order Granting Plaintiffs' Renewed Motion for Class Certification" (unnecessary capitalization omitted) in which it certified a class and two subclasses.

In June 2022, City filed a motion for summary judgment or, alternatively, summary adjudication of each of plaintiffs' remaining four causes of action (i.e., negligence, nuisance, breach of contract, and breach of warranty).[5]  On October 4, 2022, the trial court

---

[5]   Unless otherwise required for clarity, we often refer to the motion simply as one for summary judgment.

8.

granted City's motion for summary judgment. On December 27, 2022, the court entered judgment against plaintiffs and in favor of City. On January 4, 2023, City served and filed a notice of entry of the judgment.

On January 18, 2023, plaintiffs timely filed their notice of appeal. On March 6, 2023, City timely filed notice of its protective cross-appeal.

On August 11, 2025, after the parties had completed their appellate briefing, we solicited additional briefing from the parties, as discussed *post*.

## DISCUSSION

### I.  The Order Sustaining City's Demurrer to Plaintiffs' Inverse Condemnation Cause of Action

#### A.  *Inverse Condemnation Law and Standard of Review*

The takings clause in the California Constitution provides, in relevant part: "Private property may be taken or damaged for a public use … only when just compensation … has first been paid to, or into court for, the owner." (Cal. Const., art. I, § 19, subd. (a).) " 'To state a cause of action for inverse condemnation, the property owner must show that there was a taking or damaging by a public entity of a valuable property right that the property owner possesses, that the taking or damaging was for a public use, and that the invasion or appropriation directly and specially affected the property owner to his or her injury. Property is "taken or damaged" within the meaning of the California Constitution so as to give rise to a claim for inverse condemnation, when: (1) the property has been physically invaded in a tangible manner; (2) no physical invasion has occurred, but the property has been physically damaged; or (3) an intangible intrusion onto the property has occurred, which has caused no damage to the property but places a burden on the property that is direct, substantial, and peculiar to the property itself.' " (*Union Pacific Railroad Co. v. Superior Court* (2024) 105 Cal.App.5th 838, 868, fn. 17, quoting 7 Miller & Starr, Cal. Real Estate (4th ed. 2024 update) Inverse Condemnation, § 23:1, fns. omitted.)

9.

" 'We review the ruling sustaining the demurrer de novo, exercising independent judgment as to whether the complaint states a cause of action as a matter of law.' [Citation.] ' "[W]e give the complaint a reasonable interpretation, reading it as a whole and its parts in their context." ' [Citation.] 'When conducting this independent review, appellate courts "treat the demurrer as admitting all material facts properly pleaded, but do not assume the truth of contentions, deductions or conclusions of law.' " (*Kahan v. City of Richmond* (2019) 35 Cal.App.5th 721, 730.) "[W]e must treat the demurrer as admitting all material facts properly pleaded and all reasonable inferences which can be drawn therefrom." (*Bloomberg v. Interinsurance Exchange* (1984) 162 Cal.App.3d 571, 574–575.)

" ' "[T]he plaintiff has the burden of showing that the facts pleaded are sufficient to establish every element of the cause of action and overcoming all of the legal grounds on which the trial court sustained the demurrer, and if the defendant negates any essential element, we will affirm the order sustaining the demurrer …. [Citation.] We will affirm if there is any ground on which the demurrer can properly be sustained, whether or not the trial court relied on proper grounds or the defendant asserted a proper ground in the trial court proceedings." ' [Citation.] It is the trial court's ruling we review, not its reasoning or rationale." (*Kahan v. City of Richmond*, *supra*, 35 Cal.App.5th at p. 730.)

### B. Contentions and Analysis

The trial court, relying on *Williams*, *supra*, 22 Cal.App.5th 1198, sustained City's demurrer to plaintiffs' cause of action for inverse condemnation, after concluding that plaintiffs "fail[ed] to allege any facts showing how their homes were 'singled out' for special harm by … City's use of surface water," and that plaintiffs "invited the water into their homes."

In *Williams*, the plaintiffs sued water districts for inverse condemnation and private nuisance, alleging the "copper piping in their homes was damaged by a chemical [the] defendant water districts added to tap water." (*Williams*, *supra*, 22 Cal.App.5th at pp. 1200–1201.) The trial court entered judgment in favor of the water districts and the

*Williams* court affirmed the judgment. (*Id*. at pp. 1201–1202.) The *Williams* court noted the chemical the water districts added to the water "was authorized by regulation" and "complied with all statutory and regulatory standards." (*Id*. at p. 1200.) The court determined the water delivered to the plaintiffs "was treated in the same manner for *all* of the Water Districts' customers—plaintiffs were not 'singled-out' to receive water treated differently from the water delivered to all of the Water Districts' customers." (*Id.* at p. 1210.) The court continued, stating, "compensation for the damage alleged here would also 'expand compensation outside the traditional realm of eminent domain' because the plaintiffs invited the water into their plumbing systems—the delivery was consensual. … [The] [p]laintiffs voluntarily purchased the water from the Water Districts and brought the water into their private piping system." (*Id*. at p. 1211.)

Plaintiffs contend they were, in fact, "singled out" to bear the brunt of the harm caused by NE treatment facility water. That is, City's decision to deliver NE treatment facility water *to northeast Fresno residents only, and to the exclusion of other City water customers*, conferred a benefit to the entire City (by avoiding a water shortage), and imposed a burden on service area residents that should have been borne by City water customers as a whole.[6] Plaintiffs also seek to distinguish the facts of this case from those in *Williams*, arguing *Williams* involved the delivery of water that complied with express statutory authorization and that the *Williams* plaintiffs "invited what they actually received," whereas, here, plaintiffs did not consent to water that was improperly treated in violation of City's own water permit and any consent they may have given was not sufficiently informed.[7]

---

[6] Alternatively, plaintiffs argue they should have been permitted to "amend the [fourth amended] complaint (as requested at the hearing) to allege further facts describing the limited region of the City and the subset of City residents subjected to the harm caused by … City's use and provision of the treated surface water to [service area] residents."

[7] On August 11, 2025, we solicited supplemental briefing from the parties on the following issue: "If, as plaintiffs contend, the corrosion at issue was caused by the City of Fresno (City) improperly treating the water in violation of their water permit—a point not

City argues plaintiffs were not singled out because they received the same water as "thousands of City customers in Northeast Fresno … and galvanized piping is predominantly used in Fresno."  City contends no liability for inverse condemnation lies because plaintiffs "applied for and received" City water and consented to its delivery.  City further argues plaintiffs' claim sounds in tort and is outside the scope of inverse condemnation.[8]

### 1.    *Did Plaintiffs Allege They Were Singled Out for Special Harm?*

"[I]t has long been recognized that the purpose of [the state and federal takings clauses] is to ensure that individual property owners are not compelled to bear burdens or incur costs that, in fairness and justice, should be borne by the public at large."  (*Williams*, *supra*, 22 Cal.App.5th at p. 1210.)  " ' "The decisive consideration is whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking." ' "  (*Id*. at pp. 1209–1210.)

As mentioned, plaintiffs contend the water distributed from the NE treatment facility was distributed *only* to residents of a northeast section of the City.  This contention, if true, would suggest plaintiffs were singled out for special harm.  A close review of the allegations

---

conceded by City—does this alleged fact take plaintiffs' claim outside the scope of inverse condemnation claims on grounds that the operation of the surface water treatment facility in violation of City's water supply permit was not part of the 'deliberate design, construction or maintenance of the public improvement' or the function of the facility 'as deliberately conceived?'  [Citations.]"

[8]    City requested we take judicial notice of City Ordinance 2017–19 in connection with plaintiffs' challenge to the trial court's ruling on demurrer.  City contends the ordinance "is relevant in that it is an Ordinance setting water capacity fees that discusses the background policy reasons for setting such fees."  City contends "the Ordinance will aid the court in determining whether Plaintiffs were unfairly 'singled out' to receive treated surface water while others received an 'adequate groundwater supply,' " but "the City found it must use treated surface water due to an already over-drafted groundwater supply."

We deny City's request.  Although we may take judicial notice of the fact that the ordinance passed, it appears City wants us to judicially notice facts recited in the ordinance.  This we may not do.  (*Arce v. Kaiser Foundation Health Plan, Inc*. (2010) 181 Cal.App.4th 471, 482.)

of the fourth amended complaint, however, does not reveal any allegation wherein this fact was expressly stated or from which it may be inferred. Notwithstanding, nothing in the complaint appears to preclude such an allegation and City's 2004 annual water quality report suggests there is a factual basis for it. "If a complaint does not state a cause of action, but there is a reasonable possibility that the defect can be cured by amendment, leave to amend must be granted." (*Milligan v. Golden Gate Bridge Highway & Transportation Dist.* (2004) 120 Cal.App.4th 1, 6.) To the extent the trial court's ruling was premised on plaintiffs' failure to allege facts demonstrating they were " 'singled out' for special harm," that omission could have been corrected by amendment.

### 2. *Does the Fact Plaintiffs "Invited" City Water Into Their Home Preclude City From Being Held Liable for Inverse Condemnation?*

The "invited" water rationale adopted in *Williams* was called into question in *Shehyn v. Ventura County Public Works Agency* (2025) 108 Cal.App.5th 1254 (*Shehyn*), a case decided after the parties filed their opening and responsive briefs on appeal.[9]

In *Shehyn*, the plaintiff sued county water purveyors for inverse condemnation alleging the water they delivered to the plaintiff contained "an amount of sediment that was 'vastly and grossly disproportionally greater' than delivered to other properties," and which damaged his irrigation system. (*Shehyn*, *supra*, 108 Cal.App.5th at p. 1259.) The trial court, relying on *Williams*, sustained a demurrer to the cause of action and entered judgment in favor of the water districts because the plaintiff " 'invited' [water district] water onto his property." (*Shehyn*, at p. 1259.) On appeal, the *Shehyn* court concluded *Williams* did not create "a brightline rule barring inverse condemnation claims for damage caused by 'invited' water, or … as limiting inverse condemnation to damages caused by flooding." (*Shehyn*, at p. 1260.) The court declined to "perpetuate a broad exclusion that might catch meritorious claims in its net" and reversed the judgment. (*Id*. at pp. 1260, 1261.) In

---

[9] On March 26, 2025, pursuant to California Rules of Court, rule 8.254, plaintiffs' counsel notified this court of the decision rendered in *Shehyn*.

explaining its holding, the court wrote:  "What if the homeowners in *Williams*, for example, received chloramine in higher concentrations than other homeowners in the same system?  Should turning their taps preclude them from bringing an inverse condemnation claim?  We think not.  They are customers of a state-sanctioned monopoly who must choose between receiving their utility's water or none at all."  (*Id*. at p. 1260.)

We agree with *Shehyn* to the extent it declined to rule that the mere turning on of one's tap water precludes an inverse condemnation claim against water purveyors where it is alleged the water caused damage to property or persons.  Here, plaintiffs and class members rely on City water to supply their drinking water needs have no realistic alternative to meet those needs.  They are, in the words of *Shehyn*, "customers of a state-sanctioned monopoly" and "must choose between receiving [City] water or none at all."  (*Shehyn*, *supra*, 108 Cal.App.5th at p. 1260.)

### 3. *Have Plaintiffs Otherwise Alleged Sufficient Facts to State a Cause of Action for Inverse Condemnation?*

As mentioned, plaintiffs sought to distinguish the facts of *Williams* from the facts of this case by arguing they did not give informed consent to the delivery of water improperly treated in violation of City's water permit.  When plaintiffs made this argument, *Shehyn* had not yet been published.  Given our determination that the turning on of one's tap water, by itself, is an insufficient basis upon which to preclude inverse condemnation liability in situations such as those in the case at bar, this attempt to distinguish the facts of *Williams* proved unnecessary.  Moreover, although plaintiffs did allege that City "fail[ed] to operate the [NE treatment facility] with State-mandated corrosion control treatment in violation of its water permit" by "failing to rigorously control the pH levels of its water, and by modifying its corrosion control treatment without approval from the State Board," that allegation was conspicuously excluded from allegations that were incorporated into plaintiffs' inverse condemnation cause of action.  For reasons discussed below, if we were to consider this allegation (either as part of the inverse condemnation cause of action or as a

14.

proffered amendment), we conclude the allegation would take plaintiffs' claim outside the scope of inverse condemnation and would convert the claim to one that sounds in tort.

In *City of Oroville v. Superior Court* (2019) 7 Cal.5th 1091, our high court stated, "[a] court assessing inverse condemnation liability must find more than just a causal connection between the public improvement and the damage to private property. [D]amage to private property must be substantially caused by an inherent risk presented by the deliberate design, construction, or maintenance of the public improvement." (*Id*. at p. 1105.) "The inherent risk assessment requires a reviewing court to consider whether the inherent dangers of the public improvement as deliberately designed, constructed, or maintained materialized and were the cause of the property damage. [Citations.] … The inherent risk assessment … avoids open-ended liability by protecting public entities from liability for private property damage that is arguably connected to a public improvement but is not the result of the improvement's inherent risks." (*Id*. at p. 1106.)

In *Customer Co. v. City of Sacramento* (1995) 10 Cal.4th 368, our high court wrote, "damage caused by the negligent conduct of public employees or a public entity does not fall within the aegis of section 19," i.e., the state's takings clause. (*Id*. at p. 381.) Quoting prior precedent, the high court wrote, "Justice Traynor was careful to explain that '[t]he destruction or damaging of property is sufficiently connected with "public use" as required by the Constitution, if the injury is a result of dangers *inherent in the construction of the public improvement* as distinguished from dangers *arising from the negligent operation of the improvement*.' " (*Id*. at p. 382, italics in original.) "Damage resulting from negligence in the routine operation having no relation to the function of the project as conceived is not within the scope of the rule applied in the present case." (*Ibid*., italics omitted.) As stated by another court, "[w]here damage results from the acts of employees, and not from a policy decision, there is no taking. Recovery, if any, lies in a tort action, such as negligence." (*Paterno v. State of California* (1999) 74 Cal.App.4th 68, 87.)

15.

Here, City could not legally operate the NE treatment facility without a water supply permit (§§ 116525, subd. (a), 116275, subd. (g)), and it is undisputed City, after completing various studies pertaining to the facility, obtained the approvals and water supply permit amendments necessary to operate the facility. Undoubtedly, City's water supply permit was part of the deliberate design and conception of the facility. Any damages resulting from City's alleged failure to adhere to corrosion control techniques mandated by its water supply permit would not be the result of the design, construction or maintenance of the NE treatment facility as conceived but, rather, would be the result of deviating from the design of the NE treatment facility as conceived.

Plaintiffs argued they expressly alleged "a deliberate action" of City in building and operating the NE treatment facility. They further argue there was an "inherent risk" in the design because of the possibility of fluctuating pH levels. They argue negligence may support an inverse condemnation claim when it is a " 'deliberate act carrying with it the purpose of fulfilling one or another of the public objects of the project as a whole,' " quoting *Customer Co. v. City of Sacramento*, *supra*, 10 Cal.4th at page 382, italics omitted. We fail to appreciate how defying State-mandated corrosion control procedures could be considered "fulfilling … the public objects" of the NE treatment facility. Here, the deliberate design of the facility called for certain protocols to be implemented in order to achieve (or approximate) a target pH of 9.0. The alleged failure to abide by those treatment protocols was a deviation from the deliberate design of the facility and would take the case outside the scope of inverse condemnation claims.

Plaintiffs argue the unincorporated allegation that City deviated from State-mandated corrosion control procedures was merely an "alternate" allegation of fact and that the remaining factual allegations are sufficient to state a cause of action for inverse condemnation. Subject to the caveat that plaintiffs would need to amend their complaint to allege being singled out for special harm, we agree.

16.

"A plaintiff may plead inconsistent causes of action.  [Citation.]  'When a pleader is in doubt about what actually occurred or what can be established by the evidence, the modern practice allows that party to plead in the alternative and make inconsistent allegations.'  [Citation.]  This doubt can arise when [the] plaintiffs are certain of their legal rights but unsure about some of the ultimate facts or when [the] plaintiffs are reasonably certain of the facts but are unsure about their legal rights.  [Citation.]  To accommodate these uncertainties, [the] plaintiffs can generally plead 'alternative factual allegations relying on alternative legal theories.' "  (*Batta v. Hunt* (2024) 106 Cal.App.5th 295, 304.)

Plaintiffs alleged City's "maintenance and operation of its [NE treatment facility] relating to the function and purpose of the plant as conceived, including but not limited to the introduction of the surface water to the existing groundwater system without appropriate treatment to address the changing chemistry and its impact to Fresno's water supply, … caused it to deliver highly aggressive and corrosive water."[10]  Plaintiffs alleged City consultants "concluded and confirmed that the likely cause of the discolored water problem is the CITY's introduction of treated surface water into a water system that for decades relied solely upon groundwater" and, in 1998, City consultants warned that "potential water quality issues" including "increased corrosion" to plumbing may result from the introduction of a "new water source with an entirely different chemical composition" into City's water distribution system.  Plaintiffs alleged the NE treatment facility posed an "inherent risk that surface water used to provide for the growing demand of the public would cause damage and injury to those homes with galvanized pipes by stripping their protective zinc coating and causing corrosion" and the "introduction of treated surface water into Fresno's water supply as deliberately designed and conceived by the CITY caused physical damage to Plaintiffs' and Class members' properties."

---

[10]     The "without appropriate treatment" allegation is not *necessarily* the same as an allegation that City deviated from State-mandated corrosion control treatment.  Under liberal rules of construction, we decline to equate the two.

Assuming plaintiffs will amend their complaint as allowed under this opinion, plaintiffs' remaining allegations are sufficient to state a cause of action for inverse condemnation.

## II.     The Summary Judgment

### A.     *Plaintiffs Do Not Challenge the Trial Court's Adjudication of Their Claims for Breach of Contract and Breach of Implied Warranty*

In their opening brief on appeal, plaintiffs state, "[c]laims for breach of contract and breach of implied warranty are not issues on appeal." Thus, plaintiffs have abandoned any challenge to the adjudication of those causes of action. Plaintiffs' challenge to the court's entry of summary judgment, therefore, only concerns the court's adjudication of plaintiffs' negligence and nuisance causes of action.

We begin our discussion with a brief history and description of the federal Safe Drinking Water Act (federal SDWA) and state SDWA.

### B.     *Safe Drinking Water Acts*

"Congress enacted the … []federal SDWA[] (42 U.S.C. § 300f et seq.) in 1974 to establish uniform quality standards for the public water systems in the United States and to reduce contamination in drinking water." (*Coshow v. City of Escondido* (2005) 132 Cal.App.4th 687, 703 (*Coshow*).) Congress has given the state "primary enforcement responsibility for public water systems" subject to strict requirements including the state's adoption of "drinking water regulations that are no less stringent than the national primary drinking water regulations promulgated by the Administrator [of the EPA]." (42 U.S.C. §§ 300f(7), 300g-2(a); *In re Groundwater Cases* (2007) 154 CalApp.4th 659, 678, fn. 13 (*Groundwater*).)

"In 1976, the [California] Legislature enacted [the state] SDWA…. The [state] SDWA was meant to reduce to the lowest level feasible all concentrations of toxic chemicals in drinking water that may cause cancer, birth defects and other chronic diseases. [Citation.] In this regard, the [state] SDWA 'establishes standards at least as stringent as the

federal SDWA and is intended to be "more protective of public health" than the minimum federal standards.' [Citations.] Because the [state] SDWA is a remedial act intended to protect the public from contamination of its drinking water, we are required to construe it broadly to accomplish its protective purpose." (*Coshow*, *supra*, 132 Cal.App.4th at pp. 703–704.)

"One of [DHS]'s responsibilities under the [state] SDWA is to establish 'primary drinking water standards that include the maximum levels of contaminants which, in [its] judgment, may have an adverse effect on the health of persons.' [Citations.] [DHS] is also responsible for reviewing and revising public health goals for contaminants in drinking water, including preparing health risk assessments for any contaminants deemed carcinogenic or acutely toxic. [Citations.] With respect to acutely toxic substances, the maximum contaminant level (MCL) is set at a level that will avoid any known or anticipated adverse effects on public health with an adequate margin of safety. [Citation.] With respect to carcinogens, the MCL is set at a level that will avoid any risk to public health. [Citations.] [A municipality] is required to ensure its public water system complies with the primary and secondary drinking water standards established by [DHS]." (*Coshow*, *supra*, 132 Cal.App.4th at p. 704.)

In 1991, the EPA promulgated "national primary drinking water regulations for lead and copper." (40 C.F.R., § 141.80 et seq.) Those regulations "constitute a treatment technique rule that includes treatment techniques to control corrosion, treat source water, replace service lines, and provide public education." (40 C.F.R., § 141.80(b).) Subsequently, the state of California promulgated its own lead and copper rules (i.e., LCRs). (22 Cal. Code Regs., § 64670 et seq.)

The state's LCRs provide definitions for the following statutory terms relevant to the case before us: " 'Action level' … means the concentration of lead or copper in water that is used to determine the requirements … that a system shall meet." (22 Cal. Code Regs., § 64671.05.) " 'Action level exceedance' … means that the level of lead or copper is

19.

greater than the respective action level, as determined pursuant to [state regulation] section 64678(d) through (g)." (*Id.*, § 64671.08.) "The lead action level is exceeded if the concentration of lead in more than 10 percent of the tap water samples collected during any period is greater than 0.015 mg/L (i.e., if the '90th percentile' lead level is greater than 0.015 mg/L). [¶] … The copper action level is exceeded if the concentration of copper in more than 10 percent of the tap water samples collected during any period is greater than 1.3 mg/L (i.e., if the '90th percentile' copper level is greater than 1.3 mg/L)." (*Id.*, § 64678, subds. (d), (e).)

However, "[a]n action level exceedance shall not constitute a violation of [the LCRs]." (22 Cal. Code Regs., § 64670, subd. (b).) Rather, an LCR action level exceedance triggers additional duties on the part of a large public water system to bring the system into compliance. (*Williams*, *supra*, 22 Cal.App.5th at pp. 1203–1204; see, e.g., 22 Cal. Code Regs., §§ 64674, subd. (e), 64679, 64685, 64687, subds. (a), (d)(2).)

### C.     *Summary Judgment Law and Standard of Review*

"A party may move for summary judgment … if it is contended that the action has no merit." (Code Civ. Proc., § 437c, subd. (a)(1).) "A defendant … has met [its] burden of showing that a cause of action has no merit if the party has shown that one or more elements of the cause of action … cannot be established, or that there is a complete defense to the cause of action. Once the defendant … has met that burden, the burden shifts to the plaintiff … to show that a triable issue of one or more material facts exists as to the cause of action or a defense thereto." (*Id.*, § 437c, subd. (p)(2).) A motion for summary judgment "shall be granted if all the papers submitted show that there is no triable issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." (*Id.*, § 437c, subd. (c).)

A trial court's grant of summary judgment is reviewed de novo. (*Samara v. Matar* (2018) 5 Cal.5th 322, 338.) "We consider all the evidence offered in connection with the motion, except that which the trial court properly excluded." (*Salas v. Department of*

*Transportation* (2011) 198 Cal.App.4th 1058, 1067.) "Evidence presented in opposition to summary judgment is liberally construed, with any doubts about the evidence resolved in favor of the party opposing the motion." (*Regents of University of California v. Superior Court* (2018) 4 Cal.5th 607, 618.)

"In reviewing a grant of summary judgment, an appellate court must make its own independent determination of the construction and effect of the papers submitted. … The reviewing court applies the same three-step analysis as that of the trial court: (1) identification of issues framed by the pleadings; (2) determination of whether the moving party has established facts which negate the opponent's claim and justify a judgment in movant's favor; and (3) determination of whether the opponent demonstrates the existence of a triable, material factual issue." (*Varni Bros. Corp. v. Wine World, Inc.* (1995) 35 Cal.App.4th 880, 886–887; *Bashi v. Wodarz* (1996) 45 Cal.App.4th 1314, 1318; Code Civ. Proc., § 437c, subd. (a)(1).) "The court's stated reasons for granting summary judgment are not binding on us because we review its ruling, not its rationale." (*Walker v. Countrywide Home Loans, Inc.* (2002) 98 Cal.App.4th 1158, 1168.)

**D.** **_Grounds Upon Which City Moved for Summary Judgment_**

City moved for summary judgment on the following grounds: (1) that plaintiffs' causes of action are barred as matter of law under the holdings in *Hartwell Corp. v. Superior Court* (2002) 27 Cal.4th 256 (*Hartwell*) and *Groundwater*, *supra*, 154 Cal.App.4th 659 "because conclusive evidence proves … City complied with applicable drinking water standards and regulations at all relevant times" (unnecessary boldface type and capitalization omitted); (2) that City is immune from plaintiffs' suit because plaintiffs cannot meet the requirements of Government Code section 815.6. Specifically, City contends the state SDWA was not intended to protect against "economic losses due to corrosion of homeowners' privately-owned galvanized plumbing systems" (unnecessary boldface type and capitalization omitted), that the violations alleged by plaintiffs are not violations of mandatory duties imposed on City, and that plaintiffs have no facts to

21.

demonstrate City's alleged SDWA violations were the proximate cause of plaintiffs' alleged damages; and (3) that plaintiffs' causes of action are barred by the applicable statute of limitations.

### E.    Whether Plaintiffs' Claims are Barred Under *Hartwell* and *Groundwater*

In its summary judgment motion, City contended plaintiffs' claims are not judicially actionable under the holdings in *Hartwell* and *Groundwater* because plaintiffs' claims do not involve violation of an MCL.  City argues *Hartwell* and *Groundwater* stand for the proposition that "a plaintiff [must] prove violations of numeric water quality standards and an order to comply in order to pursue damages allegedly caused by drinking water."  To avoid summary judgment, City contends plaintiffs needed to produce admissible evidence "showing:  (1) the City's water supply continually exceeded primary numeric drinking water standards and regulations established by the State Board, and (2) the State Board ordered the City to cease delivering water as a result of the City's continued noncompliance."  "If a Plaintiff cannot satisfy this threshold burden," City argues, "then such plaintiff is foreclosed from pursuing damages because no liability exists."

Plaintiffs argue *Hartwell* and *Groundwater* are inapposite because the plaintiffs in those cases were challenging the adequacy of water quality standards and regulations promulgated under the SDWA; whereas, here, plaintiffs are not challenging the adequacy of drinking water standards and, instead, seek to hold City liable "for damages caused by the City's past violations of regulations and statutes *as written* in the [state SDWA] and as established by the implementing regulations of" DHS and the State Board.  We agree with plaintiffs that *Hartwell* and *Groundwater* do not bar their claims.

### 1.    *Hartwell*

In *Hartwell*, several groups of plaintiffs, in separate actions, sued various water providers and others for providing them well water contaminated with toxic substances. (*Hartwell*, *supra*, 27 Cal.4th at p. 261.)  Among the defendants were water utilities regulated by the California Public Utilities Commission (PUC), water providers not regulated by the

22.

PUC, and "corporate parties that are not water providers or regulated by the PUC." (*Id*. at pp. 260–261.) The plaintiffs asserted causes of action for negligence, strict liability, trespass, public and private nuisance, fraudulent concealment, wrongful death, conspiracy, battery, and unfair business practices. (*Id*. at p. 261.)

Once the lawsuits were initiated, the PUC investigated to determine, among other things, "(1) whether current drinking water standards adequately protect the public health and safety; [and] (2) whether the regulated water utilities have complied with those standards." (*Hartwell*, *supra*, 27 Cal.4th at p. 262.) The PUC issued a final opinion in the matter and determined "existing DHS drinking water quality standards adequately protect the public health and safety," and "over the past 25 years, the regulated utilities … provided water that was ' "in no way harmful or dangerous to health" ' and had satisfactorily complied with DHS drinking water quality requirements." (*Id.* at p. 263.)

Various defendants sought to dismiss or, alternatively, stay the plaintiffs' actions "on the ground that the litigation was barred by [Public Utilities Code] section 1759." (*Hartwell*, *supra*, 27 Cal.4th at p. 263) That statute reads, in part: "No court of this state, except the Supreme Court and the court of appeal … shall have jurisdiction to review, reverse, correct, or annul any order or decision of the [PUC] or to suspend or delay the execution or operation thereof, or to enjoin, restrain, or interfere with the [PUC] in the performance of its official duties …." (Pub. Util. Code, § 1759, subd. (a).) In writ proceedings, the Court of Appeal ruled that "the PUC's statutory authority over water quality and its exercise of jurisdiction in addressing water quality issues preempted the … actions against the regulated utilities" but did not preempt claims against the other defendants. (*Hartwell*, at p. 264.)

The California Supreme Court granted review. (*Hartwell*, *supra*, 27 Cal.4th at p. 264.) Finding the PUC had broad constitutional and legislative authority to regulate public utilities, the high court concluded preemption is found upon answering each of the following questions in the affirmative: "(1) whether the PUC had the authority to adopt a

23.

regulatory policy" on public health risks and the "steps the utilities should take, if any, to minimize the risk; (2) whether the PUC had exercised that authority; and (3) whether the superior court action would hinder or interfere with the PUC's exercise of regulatory authority." (*Id*. at p. 266.) The court concluded the first two prongs had been met but agreed that "some of the damage claims [against the regulated utilities] would not interfere with any ongoing PUC regulatory program." (*Id*. at p. 267.)

The high court wrote, "lawsuits against public utilities are barred by [Public Utilities Code] section 1759 'not only when an award of damages would directly contravene a specific order or decision of the commission, i.e., when it would "reverse, correct, or annul" that order or decision, but also when an award of damages would simply have the effect of undermining a general supervisory or regulatory policy of the commission, i.e., when it would "hinder" or "frustrate" or "interfere with" or "obstruct" that policy.' " (*Hartwell*, *supra*, 27 Cal.4th at p. 275.) However, the court clarified, "*superior courts are not precluded from acting in aid of, rather than in derogation of, the PUC's jurisdiction.* [Citation.] Thus, a court has jurisdiction to enforce a water utility's legal obligation to comply with PUC standards and policies and to award damages for violations." (*Ibid*., italics added.)

Noting that the "plaintiffs challenged both the adequacy of the [drinking water] standards and compliance with those standards," the *Hartwell* court concluded the former was barred. (*Hartwell*, *supra*, 27 Cal.4th at p. 276.) The high court wrote: "An award of damages on the theory that the public utilities provided unhealthy water, even if that water actually met DHS and PUC standards, would interfere with a 'broad and continuing supervisory or regulatory program' of the PUC," and would " 'plainly undermine the [PUC's] policy by holding the utility liable for not doing what the [PUC] has repeatedly determined that it and all similarly situated utilities were not required to do." (*Ibid*.)

Notably, *Hartwell* determined "damage claims based on the theory that the water failed to meet federal and state drinking water standards are not preempted by [Public

24.

Utilities Code] section 1759." (*Hartwell*, *supra*, 27 Cal.4th at p. 276.) And, although a jury award premised on a violation of drinking water standards would be contrary to the PUC's findings, the court concluded such an award would not be in derogation of the PUC's authority. (*Id.* at p. 277.) It explained that the PUC's findings were not part of an "identifiable 'broad and continuing supervisory or regulatory program of the [PUC]' [citation], related to such routine PUC proceedings as ratemaking [citation] or approval of water quality treatment facilities. Nor was that finding part of a broad and continuing program to regulate public utility water quality," or part of an enforcement proceeding. (*Id.* at pp. 276–277.) Thus, the court concluded a jury award premised on a violation of drinking water standards contrary to the PUC's findings would not be barred by [Public Utilities Code] section 1759.[11] (*Hartwell*, at pp. 277–278.)

The high court observed that the remedies available to the PUC to redress violations of law "are essentially prospective in nature." (*Hartwell*, *supra*, 27 Cal.4th at p. 277.) The PUC "can enforce its orders and decisions by suit [citation], by mandamus or injunction [citations], by actions to recover penalties [citations], and by contempt proceedings." (*Id.* at p. 272.) But, "[b]ecause the PUC cannot provide [compensatory] relief for past violations, those damage actions would not interfere with the PUC in implementing its supervisory and regulatory policies to prevent future harm." (*Id.* at p. 277.) The PUC's role is to "ensure present and future compliance." (*Id.* at p. 278.)

### 2. *Groundwater*

*Groundwater* involved coordinated appeals "after remand from the Supreme Court's decision in *Hartwell*." (*Groundwater*, *supra*, 154 Cal.App.4th at p. 666.) It addressed whether the trial court properly applied the holding in *Hartwell* with respect to "the court's

---

[11] *Hartwell* concluded, however, that lawsuits for injunctive relief "would 'interfere with the [PUC] in the performance of its official duties' " because the PUC had determined, as part of its investigation, that " 'no further inquiry or evidentiary hearings' were required regarding compliance" and that it did not need to take remedial action against the regulated utilities. (*Hartwell*, *supra*, 27 Cal.4th at p. 278.)

25.

discussion of [the] plaintiffs' damages claims." (*Groundwater*, at p. 668.) The court explained the issue: "Although the Supreme Court … allowed plaintiffs' damages actions to proceed to the extent they were based on the theory that the water supplied 'violated DHS and PUC standards,' *Hartwell* did not define with precision either what standards applied or what constituted a violation of those standards." (*Id*. at p. 669.)

"The trial court held that '[t]he "numerical standards" [it would] recognize in applying the *Hartwell* decision [would] be those adopted by [DHS] as "maximum contaminant levels" (MCLs) and "action levels" (ALs), and prior to the adoption of MCLs/ALs[,] those numerical standards adopted by the DHS or any predecessor or similar agency … to the extent [they] were properly incorporated in California's regulatory scheme. The Court [would] not apply any qualitative standard, such as "potable, healthful, or wholesome" …, as to do so would prospectively undermine the regulatory scheme.' " (*Groundwater*, *supra*, 154 Cal.App.4th at pp. 671, 673.) The *Groundwater* court found no error in the trial court's approach. (*Id*. at pp. 679–687.)

The court wrote: "If plaintiffs were permitted to have experts classify as 'unhealthful' water that met all applicable standards in effect at the time the water was supplied, the necessary implication of such testimony would be that the prior standards were inadequate to protect public health. Such a challenge is clearly prohibited …." (*Groundwater*, *supra*, 154 Cal.App.4th at pp. 680–681.) A contrary ruling would "create open-ended *future* liability" for … water providers and would "deprive [them] of the 'safe harbor' provided to public utilities that comply with DHS standards." (*Id*. at p. 682.)

The *Groundwater* court rejected the plaintiffs' contention "that any exceedance of an MCL, AL, or other numerical standard constitutes a 'violation' as that word was used in *Hartwell*" because the regulatory scheme "expressly permits DHS to allow water suppliers to continue to deliver water even after an MCL exceedance has been detected." (*Groundwater*, *supra*, 154 Cal.App.4th at p. 685, citing § 116655, subd. (b)(1)–(6).)

### 3.    *Analysis*

In *Hartwell*, the high court concluded Public Utilities Code section 1759 would not bar the plaintiffs' damage claims because the claims do not hinder, interfere, frustrate, or obstruct the PUC's supervisory or regulatory policies and would not contravene any order of the PUC.  (*Hartwell*, *supra*, 27 Cal.4th at pp. 267, 277–278.)  For reasons discussed below, we conclude plaintiffs' claims will not hinder, interfere, frustrate or obstruct the State Board's supervisory or regulatory policies and will not contravene any order of the State Board.

First, we conclude the remedies available to the State Board, like those available to the PUC in *Hartwell*, are essentially prospective in nature.  The State Board may (1) issue citations for SDWA violations and provide "a date for elimination or correction of the [offending condition]" and assess daily penalties "for each day that a violation occurred, and for each day that a violation continues to occur" (§ 116650, subds. (a), (c)–(e)); (2) issue an order directing compliance and preventative action (§ 116655, subd. (a)); (3) seek injunctive relief to enjoin conduct or to direct compliance with the statutory/regulatory scheme (§§ 116660, 116670); (4) petition for the appointment of a receiver to operate a public water system (§ 116665); (5) order physical or operational consolidation of water systems or the extension of service to certain areas and communities under certain circumstances (§ 116682); and (6) contract with, or provide a grant to, an administrator to provide services to a water system and require a water system to accept such services under specified circumstances (§ 116686).  We have not identified, nor has our attention been brought to, any state SDWA statute or regulation that enables the State Board to provide, or to seek, compensation for consumers who have suffered damages as a result of a water provider's violation of the state SDWA or related regulations.

Next, it is notable that in *Hartwell*, the plaintiffs' damage claims were allowed to proceed even though the PUC had found as part of its investigation that the defendant water suppliers, "over the past 25 years … had provided water that was ' "in no way harmful or

27.

dangerous to health" ' and had satisfactorily complied with DHS drinking water quality requirements." (*Hartwell*, *supra*, 27 Cal.4th at p. 263.) Because these findings were not made as part of an enforcement proceeding, or as part of broad and continuing programs related to routine matters such as ratemaking, approving new water treatment facilities, or regulating water quality, the court concluded the plaintiffs' damage claims would not be barred by Public Utilities Code section 1759. Here, in our estimation, there is no qualitative difference between the PUC's findings in *Hartwell* and the EPA and/or State Board findings in the present case related to the corrosion control optimization and compliance with lead action levels.

Here, the parties have not identified any statute comparable to Public Utilities Code section 1759, which was at issue in *Hartwell*, that is applicable here, and we have found none. Notwithstanding, we consider whether the test for preemption set forth in *Hartwell*, to determine whether the test is met here and conclude it is not. If, in this matter, the trier-of-fact makes a finding that contradicts the EPA or State Board's findings, the State Board will still be able to fully exercise its jurisdiction to employ or seek any of the remedies set forth in the state SDWA to ensure present and future compliance with said statute and related regulations. Additionally, neither the EPA nor the State Board are parties to this lawsuit and will not be bound by any such findings or by a potential damage award in favor of plaintiffs. Thus, there is no basis upon which to find preemption of plaintiffs' claims—at least with respect to their claims for compensatory damages.[12] Our conclusion in this regard is consistent with the state SDWA, which provides, in part: "The remedies provided by this chapter are cumulative and shall not be construed as restricting any remedy, provisional or otherwise, provided by law for the benefit of any party, and no judgment

---

[12] We need not determine, at this stage of the litigation, whether plaintiffs' prayer for injunctive relief is preempted. (See fn. 11, *ante*.) City did not move to strike the prayer for injunctive relief.

28.

under this chapter shall preclude any party from obtaining additional relief based upon the same facts." (§ 116745.)

In *Groundwater* and *Hartwell*, the plaintiffs' claims were premised, in part, on the contention the defendant water providers violated the state SDWA by failing to provide safe drinking water even though no numerical drinking water standard was violated. This explains why *Groundwater* focused its attention on those standards. We do not read either case as establishing that this is the only way a water provider may be held civilly liable under the state SDWA. Rather, those factors were discussed and addressed in the context of the specific litigation before the court. The context of this case is different.

Here, plaintiffs' claims do not involve a challenge to the State Board's drinking water standards. Plaintiffs' claims are that (1) City was required by the State Board and the state SDWA to comply with the water supply permit issued by the City in order to supply water from the NE treatment facility; (2) City's water supply permit required it to comply with the corrosion control protocols set forth in City's operation plans; (3) the state SDWA prohibited City from altering or modifying those protocols absent approval by the State Board; (4) City deviated from those protocols without approval of the State Board; (5) City further violated the state SDWA by failing to monitor and report discolored water complaints to the State Board, thereby, allowing the issues underlying those complaints to go unnoticed by the State Board for 12 years and preventing the State Board from exercising oversight and implementing further appropriate controls to remedy the problem; and (6) as a result of these factors, plaintiffs' plumbing has corroded to the point where it must now be replaced in order to receive water that does not continue to expose them to lead and other toxic elements.

*Hartwell* and *Groundwater* are distinguishable from the present case, and the limitations on judicially actionable violations of drinking water standards set forth in those cases are not appropriate for application here. For this same reason, plaintiffs' concession that they are not premising their claims on violations of numerical drinking water standards

does not, by itself, preclude plaintiffs from maintaining their suit.  This determination, however, does not resolve the broader issue of whether City is immune from a lawsuit.  We address that issue next.

### F.    Whether Plaintiffs' Claims Meet the Requirements of Government Code Section 815.6—Are Mandatory Duties at Issue?

In granting summary judgment in favor of City, the trial court largely focused on whether plaintiffs could meet the requirements of Government Code section 815.6, which reads:  "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."  "Government Code section 815.6 contains a three-pronged test for determining whether liability may be imposed on a public entity:  (1) an enactment must impose a mandatory, not discretionary, duty [citation]; (2) the enactment must intend to protect against the kind of risk of injury suffered by the party asserting section 815.6 as a basis for liability [citations]; and (3) breach of the mandatory duty must be a proximate cause of the injury suffered."  (*State of California v. Superior Court* (1984) 150 Cal.App.3d 848, 854.)  An "enactment" is defined, for purposes of the statute, as "a constitutional provision, statute, charter provision, ordinance or regulation."  (Gov. Code, § 810.6.)  The trial court assumed for purposes of the motion that plaintiffs met the first prong for liability under Government Code section 815.6, but concluded plaintiffs could not meet the remaining prongs and granted summary judgment in favor of City.

Plaintiffs contend City breached mandatory duties to adhere to its water supply permit in operating the NE treatment facility, citing section 116550 and State Regulation section 64661, subdivision (a), and mandatory duties to report to the state when it failed to comply with drinking water standards and when it received residents' discolored water

complaints, citing sections 116450, subdivision (a), 116530, and 116275, subdivisions (b) and (c), and State Regulation section 64664, subdivisions (a) and (f).

City contends the duties imposed under section 116550 and State Regulation section 64661 are discretionary, not mandatory, because "there are specific procedures for adjudicating compliance with a permit," citing section 116625, and "the availability of discretionary amendment procedures and a hearing process for alleged violations implies a level of discretion and permissiveness distinguishable for an obligation." This, City argues, coupled with the fact "the [L]egislature has vested 'initial and primary' authority in the State Board" and "corresponding responsibility, for establishing drinking water standards," demonstrates the discretionary nature of the duties imposed on City. City argues, " 'if the predicate enactment confers the exercise of discretion on government officials, the use of "shall" and like words will not alone support liability under the California Tort Claims Act.' "

"Whether an enactment creates a mandatory duty is a question of law: 'Whether a particular statute is intended to impose a mandatory duty, rather than a mere obligation to perform a discretionary function, is a question of statutory interpretation for the courts.' [Citation.] The enactment's language 'is, of course, a most important guide in determining legislative intent, [but] there are unquestionably instances in which other factors will indicate that apparent obligatory language was not intended to foreclose a governmental entity's or officer's exercise of discretion.' " (*Haggis v. City of Los Angeles* (2000) 22 Cal.4th 490, 499.)

### 1.     *Duties Under Section 116550 and State Regulation Section 64661*

Section 116550 provides: "(a) No person operating a public water system shall modify, add to or change his or her … method of treatment of, or change his or her distribution system as authorized by a valid existing permit issued to him or her by the

[State Board][13] unless the person first submits an application to the [State Board] and receives an amended permit … authorizing the modification, addition, or change in his or her … method of treatment.  [¶]  (b) Unless otherwise directed by the [State Board], changes in distribution systems may be made without the submission of a permit application if the changes comply in all particulars with the waterworks standards." (§ 116550; see § 116275, subd. (b).)  State Regulation section 64661 provides similarly:  "A supplier shall operate each treatment plant in accordance with an operations plan that has been approved by the State Board….  The operations plan shall be designed to produce the optimal water quality from the treatment process.  The supplier shall operate its treatment plant in accordance with the approved plan." (22 Cal. Code Regs., § 64661, subd. (a).)

The duties under section 116550 and State Regulation section 64661 are stated in mandatory terms.  Addressing points raised by City, the determination that DHS has " 'initial and primary authority, and the corresponding responsibility, for establishing drinking water standards,' " does not seem to us to have any bearing on whether duties imposed upon City under section 116550 are mandatory.  Moreover, "the availability of discretionary amendment procedures" is discretion vested, by and large, in the State Board, not City.  Absent a contrary direction from the State Board, any discretion City has under subdivision (b) of section 116550 to change its distribution system is expressly conditioned on its compliance with waterworks standards (i.e., compliance with the "regulations adopted by the state board entitled 'California Waterworks Standards' " found in chapter 16, division 4, title 22 of the California Code of Regulations. (§ 116275, subd. (q).)  Regulations under the California Waterworks Standards include, without limitation:  State Regulation section 64556, subdivision (a)(4)(B) [requiring a water supplier to apply for an

---

**13**     The State Board has "succeed[ed] to and is vested with all of the authority, duties, powers, purposes, functions, responsibilities, and jurisdiction of the State Department of Public Health, its predecessors, and its director for purposes of" the state SDWA. (§ 116271, subd. (a)(4).)  A reference to the "Department" in the state SDWA is a reference to the State Board. (§ 116275, subd. (b).)

32.

amended domestic water supply permit prior to making any addition or change to a mandated treatment process]; and State Regulation section 64600, subdivisions (a) and (b) [providing that water systems that have been directed to develop a "Water System Operations and Maintenance Plan (Plan)" "shall operate in accordance with its State Board-approved Plan"]. Consequently, any discretion City may have had to change its distribution system under section 116550, subdivision (b), without first obtaining an amendment to its water supply permit, was conditioned upon it adhering to the water treatment protocols identified in its State Board approved operation plan(s).

Absent an amendment to its permit, City had no discretion to alter or forego the water treatment protocols identified in its operation plans. We conclude City was under a mandatory duty to adhere to those protocols in operating the NE treatment facility.

### 2. *Other Statutory and Regulatory Duties*

In their governing complaint, plaintiffs contend City violated section 116450 by failing "to file a report with the State when any prima[r]y drinking water standard—including in those set forth in the LCRs—is not complied with, or when a monitoring requirement is not performed." Said statute provides, in part: "When any primary drinking water standard specified in the department's regulations is not complied with, [or] when a monitoring requirement specified in the department's regulations is not performed … the [operator of] the public water system shall notify the department and shall give notice to the users of that fact …." (§ 116450, subd. (a).) Plaintiffs also alleged City violated State Regulation section 64664. That regulation provides, in part: "For each calendar month, a supplier shall submit a report to the State Board … that includes the applicable information in this section for each treatment plant." (22 Cal. Code Regs., § 64664, subd. (a).) Among other things, "[t]he report shall include a summary of water quality complaints." (*Id.*, § 64664, subd. (f).)

Plaintiffs contend City's alleged failure to adhere to the reporting and notification requirements "prevented the State Board from conducting any oversight and resolving the

issue." City, for its part, does not argue these reporting requirements are discretionary. Rather, they argue the purpose of the section is health-related and not related to protecting against corrosion of constituents' residential plumbing. We address those contentions in the following subsection of this opinion.

The reporting requirements under section 116450 and State Regulation section 64664 are stated in mandatory terms and City has not proffered, and we have not found, a basis upon which to conclude City's compliance with those enactments is discretionary. We conclude those enactments create mandatory reporting duties and, in the case of section 116450, subdivision (a), mandatory notification duties.

### G. Whether Plaintiffs' Claims Meet the Requirements of Government Code Section 815.6—Are Plaintiffs' Injuries Within the Protected Zone of Interest?

Having determined that the enactments cited by plaintiffs impose mandatory duties on City, we now turn to whether the Legislature intended to protect against the kind of risk of injury alleged by plaintiffs. We conclude it did.

" '[S]ection 815.6 requires that the mandatory duty be "designed" to protect against the particular kind of injury the plaintiff suffered. The plaintiff must show the injury is " 'one of the consequences which the [enacting body] sought to prevent through imposing the alleged mandatory duty.' " [Citation.] Our inquiry in this regard goes to the legislative *purpose* of imposing the duty. That the enactment "confers some benefit" on the class to which plaintiff belongs is not enough; if the benefit is "incidental" to the enactment's protective purpose, the enactment cannot serve as a predicate for liability under section 815.6.' " (*Guzman v. County of Monterey* (2009) 46 Cal.4th 887, 898.)

Plaintiffs contend the " 'SDWA is a remedial act intended to protect the public from contamination of its drinking water, [and courts] are required to construe it broadly to accomplish its protective purpose,' " quoting *Coshow*, *supra*, 132 Cal.App.4th at page 704. Plaintiffs argue "the corrosion of Plaintiffs' galvanized pipes … is not mere injury to property, it is the mechanism of water contamination that endangers their health and

34.

welfare." They argue corrosion control treatment and monitoring "are designed to prevent drinking water contamination with metals leaching from corroded pipes that poses a risk to human health and welfare."

City contends the state and federal SDWAs and implementing regulations are aimed at protecting public health and not "intended to protect against economic losses due to corrosive damage to privately-owned pipes." City argues that, to the extent the state or federal SDWAs protect against the types of injury alleged by plaintiffs, that benefit is incidental and insufficient to meet the second prong of Government Code section 815.6. Plaintiffs have the better argument.

We begin by acknowledging that both the state and federal SDWAs are intended to protect public health.[14] The parties do not dispute the point. That recognition, however, does not render plaintiffs' arguments meritless.

"Our fundamental task in interpreting a statute is to determine the Legislature's intent so as to effectuate the law's purpose. We first examine the statutory language, giving it a plain and commonsense meaning. We do not examine that language in isolation, but in the context of the statutory framework as a whole in order to determine its scope and purpose

---

[14] In enacting the state SDWA, the Legislature found and declared, "It is the policy of the state to reduce to the lowest level feasible all concentrations of toxic chemicals that, when present in drinking water, may cause cancer, birth defects, and other chronic diseases." (§ 116270, subd. (d).) The Legislature stated its intent "to improve laws governing drinking water quality, to improve upon the minimum requirements of the federal [SDWA], to establish primary drinking water standards that are at least as stringent as those established under the federal [SDWA], and to establish a program under this chapter that is more protective of public health than the minimum federal requirements." (§ 116270, subd. (f).) Similarly, in amending the federal SDWA in 1996, the Congress found "safe drinking water is essential to the protection of public health"; "procedures for assessing the health effects of contaminants establishing drinking water standards should be revised to provide greater opportunity for public education and participation"; and set forth criteria for "more effective protection of public health." (Pub.L. 104–182, § 3(1), (6), (8) (Aug. 6, 1996) 110 Stat. 1615.)

and to harmonize the various parts of the enactment." (*Coalition of Concerned Communities, Inc. v. City of Los Angeles* (2004) 34 Cal.4th 733, 737.)

The alleged injury at issue here is the severe corrosion of plaintiffs' and class members' residential plumbing. Regulations under both the state and federal SDWAs speak directly to the issue of corrosion control.

Federal Regulation part 141.80(a) states, in part: "The requirements of this subpart constitute the national primary drinking water regulations for lead and copper." Subpart (b) of said part states, in part: "The regulations in this subpart constitute a treatment technique rule that includes treatment techniques to control corrosion …." (40 C.F.R., § 141.80(b).) Federal Regulation part 141.81, titled "Applicability of corrosion control treatment steps to small, medium, and large water systems," provides, in part, "[a]ll water systems are required to install, optimize, or re-optimize optimal corrosion control treatment (OCCT) in accordance with this section." (40 C.F.R., § 141.81(a).) Federal Regulation part 141.82, titled "Description of corrosion control treatment requirements," "provides the requirements for systems and States designating optimal corrosion control treatment (OCCT) for a system that is optimizing or re–optimizing OCCT.[15] All systems must complete the corrosion control treatment requirements in this section as applicable under [Federal Regulation part] 141.81."

" 'The purpose of these [federal] regulations is to protect public health by minimizing lead and copper levels in drinking water, *primarily by reducing water corrosivity*. [Citations.] [Citations.] Lead and copper enter drinking water primarily through corrosion of service and plumbing lines and plumbing materials. (*Williams*, *supra*, 22 Cal.App.5th at p. 1203, italics added.) " 'Most lead contamination is from corrosion by-products.' …

---

**15** Federal Regulation part 141.2 provides, in part: "Optimal corrosion control treatment (OCCT), for the purpose of subpart I of this part only, means the corrosion control treatment that minimizes the lead and copper concentration at users' taps while ensuring that the treatment does not cause the water system to violate any National Primary Drinking Water Regulations in this part."

'The amount of lead in drinking water depends heavily on the corrosivity of the water.' " (*Concerned Pastors for Social Action v. Khouri* (2016) 217 F.Supp.3d 960, 964, quoting 56 Fed.Reg., § 26460-01.)

Similarly, state regulations promulgated in connection with the state LCR require large water systems to complete a corrosion control study unless certain criteria are met (22 Cal. Code Regs., § 64674, subd. (c)); provide a procedure for such studies (*id.*, § 64683); provide requirements for the installation and operation of corrosion control treatment (*id.*, § 64684); and require monitoring of water quality parameters following installation of corrosion control treatment (*id.*, § 64682). State regulations recognize that "[l]ead enters drinking water primarily as a result of the corrosion, or wearing away, of materials containing lead in the water distribution system and household plumbing." (*Id.*, § 64687, subd. (a)(1)(C)2).)

"[W]e are required to construe [the state SDWA] broadly to accomplish its protective purpose." (*Coshow, supra*, 132 Cal.App.4th at p. 704.) Enactments pursuant to both the state and federal SDWAs expressly acknowledge the importance and need for corrosion control to prevent toxicity in drinking water. Thus, we conclude corrosion control is among the express purposes of the state SDWA and related enactments and these enactments were designed to protect against the type of injury suffered by plaintiffs.

### H.    Whether Plaintiffs' Claims Meet the Requirements of Government Code Section 815.6—Are There Triable Issues of Material Fact Related to Causation?

In arguing that plaintiffs are unable to meet the third prong for liability under Government Code section 815.6 (i.e., causation), City relied primarily on its argument that there can be no actionable violations of the state SDWA statutory and regulatory scheme because City has "complied at all relevant times with applicable drinking water standards and regulations, including the LCR's corrosivity standards." However, we have already rejected the idea that a judicially actionable violation under the state SDWA may only occur when there has been a violation of an MCL or continuing action level exceedances, coupled

37.

with a State Board order requiring the cessation of water deliveries. Having rejected this argument, we now examine whether City met its burden on summary judgment with regard to this element.[16]

To meet its burden on summary judgment, a "defendant may … present evidence that conclusively negates an element of the plaintiff's cause of action" or may "present evidence that the plaintiff does not possess, and cannot reasonably obtain, needed evidence—as through admissions by the plaintiff following extensive discovery to the effect that he has discovered nothing." (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 855.) In either case, a defendant must present evidence and cannot rely on a mere contention that the plaintiff cannot prove the element. (*Id*. at pp. 854–855.)

### 1.    *Did City Meet Its Burden on Summary Judgment re: Causation?*

In moving for summary judgment, City proffered numerous, purportedly undisputed, material facts (UMFs) that it contended were relevant to whether plaintiffs' claims were barred by City's sovereign immunity. Only some of those UMFs appear relevant to the issue of causation. The UMFs proffered by City included: (1) a reiteration of plaintiffs' allegations; (2) plaintiffs' discovery responses claiming City breached an implied agreement—based on the SDWA and LCR—"to provide [them] with 'potable, clean, safe, reliable, non-corrosive, and non-harmful drinking water that complied with" the state and federal SDWAs; (3) plaintiffs' acknowledgement they do not seek damages for personal injuries; (4) plaintiffs' admission their action is not based on "violations of numeric drinking water standards"; (5) evidence that City's NE treatment facility operations plans authorized

---

[16]    Because of City's misplaced reliance on *Hartwell* and *Groundwater*, we solicited additional briefing from the parties on the following issue: "*If* [this court] conclude[s] City is *not* correct in its premise that 'only numeric drinking water standards are enforceable' under the state Safe Water Drinking Act (state SDWA), and that, as a theoretical matter, a claim for personal property damages may be based on a violation of a water supply permit as alleged by plaintiffs—or, stated another way, if we conclude *Hartwell* and *Groundwater* do not prohibit plaintiffs' claim—did City meet its burden on summary judgment of demonstrating that the third prong for liability under Government Code section 815.6 cannot be met?"

it "to provide corrosion control through pH adjustment and the addition of corrosion inhibitors"; (6) the fact that City's operation plans "do not mandate that the City maintain a strict pH of 9.0 at all times"; (7) the fact that the State Board never suspended or revoked City's water supply permit and evidence that it has never issued City a written citation, compliance order, or order to appear related to alleged violations related to plaintiffs' claims; (8) evidence that City has complied with the AL for lead; (9) evidence the EPA determined City's water system was optimized for corrosion control since 1996; (10) the fact that City collects samples from well sites every three years and tests for iron, which results are used to determine City's compliance with secondary MCLs for iron; (11) the fact that the water samples taken from customer's fixtures are not used to determine compliance with secondary MCLs for iron; (12) evidence that City complied with the secondary MCL for iron at all relevant times; and (13) the fact that "City undertook extensive efforts … to plan, study, test, build and ultimately operate" the NE treatment facility.

Some of the UMFs submitted by City (e.g., the existence of an implied agreement) appear related solely to plaintiffs' abandoned breach of contract and breach of warranty claims. Other UMFs (e.g., the lack of a written citation, cessation order, or other order to appear at an administrative hearing) are related primarily to City's contention that only a violation of numerical drinking water standards is actionable and that absent an order to cease delivery of water, no action lies—a contention we have rejected. Still other UMFs (e.g., that plaintiffs are not seeking damages for personal injuries) appear directed toward City's contention that the state SDWA and related enactments are not intended to protect against corrosion—again, a contention we have rejected.

As we see it, plaintiffs' negligence claim is largely based on the contention that City deviated from the corrosion control treatment protocols set forth in City's operation plans which City's water supply permit (and § 116550) made mandatory. The UMFs City proffered on this subject are that the State Board and EPA have determined that City's water

system was optimized for corrosion control and that City has complied with the AL for lead and secondary MCL for iron.

The contention that City complied with the secondary MCL for iron is supported solely by a conclusory statement to that effect in the declaration of Robert Little, a City Water Systems Supervisor I, and contains no supporting evidence or explanation. Yet, plaintiffs correctly note that City's annual water quality reports for several years show samples taken during the relevant time frame exceeded the secondary MCL for iron.

The contention that City has complied with the AL for lead is based on the results of City's sampling and testing procedures as evaluated by the EPA. However, the EPA expressly stated in their 2017 LCR review of City's water system that although City "identified sufficient Tier 1 sampling sites for lead and copper tap samples, … the sample site selections have not been updated since 1993 and may not adequately represent the portion of the service area served by the [NE treatment facility]." Notably, in its review, the EPA stated, "[t]he protocol for collecting lead and copper tap samples … generally does not include special-purpose samples [for investigations of lead and copper in tap water] unless they meet the site selection criteria in the rule." The EPA further stated, "[t]he regulations which define Tier 1-3 sample sites do not include galvanized iron pipe among the criteria for inclusion," although it noted that, if there are "insufficient Tier 1-3 sites," samples may be taken from "representative sites," which "could include galvanized iron pipe." Finally, the EPA stated, that with few exceptions, all samples were taken from Tier 1 sites. Thus, the sampling sites utilized for the review, by and large, did not include samples taken from the residences of plaintiffs or class members—all of whom have galvanized iron pipe plumbing. The EPA and State Board's determination that City's water system is optimized for corrosion control was also based on those same, non-representative sampling sites.

We do not view this evidence as sufficient to meet City's burden on summary judgment with respect to the causation prong under Government Code section 815.6. City did not conclusively negate the causation element and did not establish through plaintiffs'

discovery responses (or otherwise) that plaintiffs have no evidence and cannot obtain evidence to support the third prong under Government Code section 815.6. As a result, City's motion did not shift the burden to plaintiffs "to show that a triable issue of one or more material facts exists" as to causation. (Code Civ. Proc., § 437c, subd. (p)(2).) Nevertheless, we review plaintiffs' responsive evidence below.

### 2. *Plaintiffs' Evidence of Causation*

Plaintiffs produced evidence that in 1998, City was informed by its consultants, HDR Engineering, Inc., and the HDR Water Quality and Corrosion Service Laboratory, Bellevue, WA (together, HDR), that a majority of homes in the area serviced by the NE treatment facility were plumbed with galvanized pipe and that water supplied by the facility might have a deleterious effect on such plumbing unless treated properly including, without limitation, by maintaining a high pH.

In its 1998 draft report,[17] HDR wrote, "In Fresno households, galvanized piping predominates with well over 50 percent of the installation"; pipe samples taken from areas within Fresno "were found to be in excellent condition"; "[g]alvanization layers in premise plumbing are still largely intact. Preserving the galvanization layer is the key to minimizing potential red water/aesthetic problems," "[m]aintaining a high pH will substantially extend the service life of the existing galvanization layers," and "pH is the controlling factor for iron release—a full unit decrease can substantially increase [iron] release."[18]

The 1998 HDR draft report further stated: "There is substantial potential for extended service life of this plumbing material as long as the existing galvanization layer remains intact." "A high pH policy would, essentially, make the existing iron-based scales

---

[17] The parties did not produce a final report from HDR.

[18] As one author put it, the "tenths of pH units are exponentially more significant than they seem, as pH is measured on a logarithmic scale." (Nowatzke, *It's a Soft Shell Life for Me: The Case for Expanding NPDES Permitting to Include Causes of Ocean Acidification* (2024) 29 Ocean & Coastal L.J. 51, 56.) "This concept is highlighted by the following example: 'pH 4 is ten times more acidic than pH 5 and 100 times (10 times 10) more acidic than pH 6.'" (*Id*. at pp. 56–57, fn. 22.)

'bullet-proof' to water quality variations." In order to maintain a stable pH throughout the distribution system, HDR recommended "a permanent finished water pH target of 9.0 be established, and that this level be maintained regardless of the treatment option selected for [the surface water]." City's 2004 and 2011 operation plans for the NE treatment facility incorporated the target pH of 9.0 into their corrosion control provisions.

When the City commenced its 2016 investigation, it hired Water Quality & Treatment Solutions, Inc. (WQTS) and Dr. Vernon L. Snoeyink to evaluate the discolored water occurrences experienced by service area residents. In a 2016 report, WQTS wrote: "Analysis of the data and information … suggests that the increase in discolored water incidents was most likely caused by the corrosion of galvanized iron pipes used either as service laterals (between the water meter and the home) or in indoor plumbing…. [I]n many of the impacted homes, the zinc layer appears to have completely corroded exposing the mild steel to the water, which then continued to corrode and release iron into the water…. [¶] … 60% of homes sampled had an average iron concentration higher than the secondary drinking water limit …." "Virtually all … reactions relevant to metal corrosion are dependent on the pH of the water…. There are two aspects to pH that are important for corrosion considerations: First, the pH value: In general, low(er) pH values favor metal corrosion, while high(er) pH values tend to promote metal precipitation, and thus reduced metal release into the water. Second, the variability of pH: fluctuations in the pH of the water are problematic, as they do not allow the metal surface to establish a fixed protective layer."

The 2016 WQTS report reiterated the need to maintain pH in the targeted range of 9.0 and determined the pH level of water from the NE treatment facility ranged from 7.8 to 9.1 for the period 2006 through 2014. According to City's consultants, the target pH of 9.0 "was not matched closely during the analysis period." WQTS suggested City recommend to its residents that they replace their galvanized pipes and that City consider banning "future use of galvanized pipes in premise plumbing."

42.

At a community meeting conducted by City and the State Board's Division of Drinking Water (DDW) in connection with the 2016 investigation, the DDW included a power point slide that stated, "City installed corrosion control treatment at [wellheads] PS 129, 133, 140, 168, 197, 308 and 321 during annual plant shutdown from 2006 to 2011." Directly underneath this bullet point, the slide reads: "Violates permit and regulation that requires a revised permit and approval prior to installation of any new treatment." Another slide from that presentation contained the following recommendation: "Stabilize water quality by bringing the chemistry of the surface water to the chemistry of the groundwater (pH, alkalinity, phosphate)" and "Move towards a galvanized pipe-free future."

DDW also found "City failed to properly track and report customer complaints" to the State Board as required and "operated in violation of [its] Water Supply Permit by installing wellhead corrosion control treatment during the annual plant shutdown without receiving approval." The former determination was echoed in a 2016 email from a State Board representative to City. That same representative also wrote to plaintiff Karen Micheli, that the State Board "was not aware of the severity of the issues or the volume of complaints until early 2016 as they were never reported. Had they been properly reported, the [State Board] would have required a full investigation and modifications to resolve the issue." SDWA reporting duties are designed to do just that—i.e., alert the responsible oversight agency of problems experienced by drinking water customers so that the agency can timely investigate and take whatever action may be needed to correct and resolve the issues. (*Guzman v. County of Monterey* (2009) 178 Cal.App.4th 983, 994.) Any failure in that regard may well have a causative dimension under the circumstances presented.

We are required to liberally construe plaintiffs' evidence and to resolve close issues in their favor. (See *Regents of University of California v. Superior Court*, *supra*, 4 Cal.5th at p. 618.) Although we have already concluded City's evidence was insufficient to meet its burden on summary judgment on the causation issue, we also conclude plaintiffs' evidence submitted in opposition to City's summary judgment motion is sufficient to avoid summary

adjudication on the alleged ground the causation prong of Government Code section 815.6 cannot be met.

## I. Plaintiffs' Nuisance Cause of Action

Plaintiffs contend their nuisance claim is not based on Government Code section 815.6, but, rather, on Civil Code sections 3479 through 3503. City contends plaintiffs' nuisance claim is barred by Civil Code section 3482 and plaintiffs cannot rely on the statutes mentioned because "legal issues on summary judgment [are] properly fixed by reference to [plaintiffs'] pleadings" and plaintiffs did not mention them in the governing complaint. Below, we conclude plaintiffs were not required to plead a statutory basis for their nuisance claim and that the claim is not barred by Civil Code section 3482.

### 1. *Plaintiffs Were Not Required to Plead a Statutory Basis for Nuisance*

Civil Code section 3479 provides, in relevant part: "Anything which is injurious to health, … or is indecent or offensive to the senses, or an obstruction to the free use of property, so as to interfere with the comfortable enjoyment of life or property … is a nuisance." Plaintiffs argue that, to prevail on a nuisance claim, they need only show that City "caused something that interfered with the plaintiff[s'] property interest." City relies on *Danieley v. Goldmine Ski Associates* (1990) 218 Cal.App.3d 111 for the proposition that plaintiffs cannot rely upon Civil Code section 3479 to support the nuisance claim because the statute was not expressly mentioned in the governing complaint. The relevant portion of the *Danieley* case reads: "Whenever a court must rule on a motion for summary judgment, the factual issue guidelines for such motion are fixed by reference solely to the pleadings." (*Danieley*, at p. 119.)

*Danieley* is inapposite. In that case a skier sued a ski run operator after she lost control of her skis on a downhill run and collided with a tree "just beyond the groomed edge of the run." (*Danieley v. Goldmine Ski Associates*, *supra*, 218 Cal.App.3d at p. 114.) "[T]he ultimate factual issue raised by [plaintiff skier's negligence claim] was limited to

whether [the ski run operator] was negligent in failing to remove the tree with which plaintiff [skier] collided." (*Id*. at p. 119.) In an effort to avoid summary judgment, the plaintiffs "attempted to inject a further factual issue, namely whether [the ski run operator] and its ski patrolmen had been negligent in caring for plaintiff [skier] *after the collision*." (*Ibid*.) Because there was no corresponding allegation in the complaint, the *Danieley* court concluded "the trial court properly ignored it." (*Id*. at pp. 119–120.)

Here, City does not contend plaintiffs are attempting to inject new *factual* issues into the case. Rather, City contends plaintiffs failed to cite the statute upon which they were relying for their nuisance claim. Consequently, the quote in *Danieley* relied upon by City is inapposite. City has not provided any other authority upon which to rule in their favor on this ground, and we are aware of none.

### 2. *Civil Code Section 3482 Does Not Entitle City to Summary Judgment*

City contends plaintiffs' nuisance claim is barred by Civil Code section 3482, which provides: "Nothing which is done or maintained under the express authority of a statute can be deemed a nuisance." City further contends that, although said section speaks in terms of the "authority of a statute," it has been "interpreted to include regulations and other express government approvals," citing *Carson Harbor Village, Ltd. v. Unocal Corp.* (9th Cir. 2001) 270 F.3d 863, 888 and *Katcher v. Home S. & L. Assn.* (1966) 245 Cal.App.2d 425, 429–430.

City's argument, however, expressly depends upon this court accepting its position that "conclusive evidence proves the City complied with applicable drinking water standards and regulations under the SDWA … and the State Board has never issued the City a cessation order." This is essentially the same argument we rejected in concluding *Hartwell* and *Groundwater* do not preclude a lawsuit premised on allegations City failed to adhere to requirements stated in its water supply permit. Moreover, as discussed, the evidence City produced to prove its compliance with drinking water standards is not conclusive. The sample sites the EPA and/or State Board relied upon to determine City's

45.

compliance with those standards were not representative of homes with galvanized iron-pipe plumbing. And, City has not identified any legal authority to demonstrate it was authorized to deviate from corrosion control protocols required under the operation plans approved in City's water permit. City's argument does not support the summary adjudication of plaintiffs' nuisance cause of action.

### J.       Are Plaintiffs' Claims Time-Barred?

City advances a number of arguments in support of its assertion that it is entitled to judgment on, or adjudication of, the plaintiffs' causes of action for negligence and nuisance on grounds the claims are time barred.[19] We address each argument below.

### 1.       *Plaintiffs' Nuisance Cause of Action*

City seemingly recognizes that, if plaintiffs' nuisance claim is for a continuing nuisance, plaintiffs might avoid summary adjudication of the claim on grounds it is time barred. To counter this possibility, City argues plaintiffs have waived any claim based on a continuing nuisance theory because they did not (1) allege it in their governing complaint or appellate briefing, or (2) raise it with the trial court in opposing City's summary judgment motion. Neither contention has merit.

"Where a nuisance is of such character that it will presumably continue indefinitely it is considered permanent, and the limitations period runs from the time the nuisance is created. [Citations.] On the other hand, if the nuisance may be discontinued at any time it is considered continuing in character. [Citations.] Every repetition of a continuing nuisance is a separate wrong for which the person injured may bring successive actions for damages until the nuisance is abated, even though an action based on the original wrong may be barred." (*Phillips v. City of Pasadena* (1945) 27 Cal.2d 104, 107–108.) " '[T]he "continuing" nature of the nuisance refers to the continuing [but abatable] damage caused

---

[19]     The trial court, having granted summary judgment in favor of City on other grounds, "decline[d] to address the City's [summary judgment] argument that plaintiffs' claims are barred by the statute of limitations."

46.

by the offensive condition, not to the acts causing the offensive condition to occur.' "
(*Capogeannis v. Superior Court* (1993) 12 Cal.App.4th 668, 681 (*Capogeannis*).)

City has not provided authority to show that a plaintiff, when asserting a nuisance claim, must specifically allege the nuisance is continuing or else the contention is waived. Moreover, there is authority to the contrary. In *Capogeannis*, plaintiff land purchasers sued defendant sellers more than three years after discovering and removing leaking gas and diesel tanks buried on the property. (*Capogeannis*, *supra*, 12 Cal.App.4th at pp. 672–673.) Assuming the claim was for a permanent nuisance, the defendants moved for summary judgment on grounds the claim was barred by the three-year statute of limitations. (*Id*. at pp. 672, 673, 679.) The plaintiffs "acknowledged that their complaint did not 'specify whether the nuisance is continuing or permanent,' but offered to amend their complaint 'to allege continuing nuisance … if the court so require[d].' " (*Id*. at p. 680.) The trial court declined the offer and granted defendant's motion. (*Id*. at p. 673.)

The *Capogeannis* court held that, to counter the claim that the nuisance was continuing, the defendants had to "establish as a matter of law *either* that the nuisance was in fact permanent *or* that the [plaintiffs] had irreversibly bound themselves to a theory of permanent nuisance." (*Capogeannis*, *supra*, 12 Cal.App.4th at p. 680.) Concluding neither had been established, the court directed the trial court to vacate its order summarily adjudicating the nuisance cause of action. (*Id*. at pp. 682–685.) " '[I]n doubtful cases the plaintiff should have an election to treat the nuisance as either permanent or not' "[20] (*Id*. at p. 677; see *id*. at pp. 679, 682.)

Here, plaintiffs contend their galvanized plumbing has deteriorated to the point of requiring replacement. Thus, there may be an argument that plaintiffs' damages are no

---

[20]    The *Capogeannis* court added: "We by no means intend to encourage plaintiffs to delay an election between continuing and permanent nuisance or trespass in a case which admits of such an election. The better practice would be to manifest the election in the complaint if possible, and in any event the election must be clear enough and timely enough to avoid prejudice to the defendant." (*Capogeannis*, *supra*, 12 Cal.App.4th at p. 684.)

longer abatable and that the nuisance has become permanent. However, even if this argument is accepted (an issue that we do not decide on appeal), there is a counter argument that, prior to that point, the alleged nuisance, as a practical matter, was abatable and, therefore, continuing. The evidence before us does not lend itself to a determination of when a possible transition between a continuing and permanent nuisance, if any, may have occurred.

Notably plaintiffs alleged in their governing complaint that "the blended [surface] water and groundwater has caused *and continues to cause* such corrosion and harm." (Italics added.) This allegation signaled to City the continuing nature of the alleged nuisance. In their reply brief in support of their renewed motion for class certification, plaintiffs alerted City and the trial court that "their nuisance claim is continuing" and that they "allege a <u>continuing</u> nuisance." (Emphasis in original.) Plaintiffs also raised the issue in their opposition to City's summary judgment motion, stating, "Plaintiffs do assert a continuing (abatable) nuisance … because the injuries are abatable through remediation."

Plaintiffs were not required to address the issue in their opening brief on appeal because the trial court did not base its order granting summary judgment on statute of limitation grounds. Plaintiffs reserved their right to submit supplemental briefing on the issue if this court were inclined to affirm the judgment on grounds not relied upon by the trial court. (Code Civ. Proc. § 437c, subd. (m)(2).) Nevertheless, plaintiffs did respond to City's argument in their reply brief on appeal.

We conclude plaintiffs have not waived the issue and City was not prejudiced by any purported delay in alerting them to the fact that plaintiffs were pursuing a continuing nuisance theory. Nothing in the record compels the conclusion that plaintiffs elected to pursue a permanent nuisance theory and we are unable to conclude, as a matter of law, that the alleged nuisance was permanent in nature at any particular time prior to plaintiffs filing suit. As a result, City is not entitled to judgment or summary adjudication of plaintiffs' nuisance claim on grounds the claim is time barred.

## 2. *Plaintiffs' Negligence Cause of Action*

City contends that undisputed material facts demonstrate plaintiffs' negligence cause of action is time barred. According to City, undisputed facts show that plaintiffs observed "discolored water coming from the pipes in their homes" no later than 2012; that plaintiffs' claims had accrued by that time; and that plaintiffs did not present their claims until 2016— well beyond statutory deadlines. City argues that, although the "application of the statute of limitations is normally a question of fact, it may be resolved as a question of law when uncontradicted facts are susceptible to only one legitimate inference," citing *Lyles v. State of California* (2007) 153 Cal.App.4th 281, 285 (*Lyles*).

Plaintiffs contend City, in asserting its statute of limitations defense in its summary judgment motion, had the "initial burden to produce evidence establishing it has a complete defense as to every single member of the class action, not just the class representatives." They argue City was required to produce class-wide evidence in order to seek summary adjudication of their negligence cause of action. Plaintiffs further argue they "produced facts in this case that warrant the application of the delayed discovery rule and equitable estoppel on a class-wide basis." They contend the damage to their plumbing was latent, and that the mere observation of discolored water coming from their taps did not "constitute awareness of the injury." We conclude plaintiffs have better arguments.

Injuries to real property are typically governed by a three-year statute of limitations. (Code Civ. Proc., § 338.) In addition, a party suing a governmental entity must adhere to the claims presentment statutes provided in Government Code section 810 et seq., unless the claim is excepted from the requirement. (Code Civ. Proc., § 313; Gov. Code, § 905.) Here, plaintiffs' negligence claims are not of a type excepted from the claims presentment statutes (Gov. Code, § 905) and needed to be presented "not later than one year after the accrual of the cause of action" (*id.*, § 911.2, subd. (a)).

"The statute of limitations usually commences when a cause of action 'accrues,' and it is generally said that 'an action accrues on the date of injury.' [Citation.] … These

general principles have been significantly modified by the common law 'discovery rule,' which provides that the accrual date may be 'delayed until the plaintiff is *aware of her injury and its negligent cause.*' " (*Bernson v. Browning-Ferris Industries* (1994) 7 Cal.4th 926, 931, italics added; *Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 397–398; *Lyles*, *supra*, 153 Cal.App.4th at p. 287 ["The plaintiff need only be aware of his or her injury and have knowledge of sufficient facts to place him or her on actual or inquiry notice that the injury has a negligent cause."].) "Under the delayed discovery rule, the limitations period does not begin to run until a plaintiff discovers or could have discovered through the exercise of reasonable diligence all facts essential to her cause of action. [Citation.] … Whether reasonable diligence was exercised is generally a question of fact [citation] precluding summary judgment." (*Sylve v. Riley* (1993) 15 Cal.App.4th 23, 26, fn. omitted.)

"A common thread seems to run through all the types of actions where courts have applied the discovery rule. The injury or the act causing the injury, or both, have been difficult for the plaintiff to detect. In most instances, in fact, the defendant has been in a far superior position to comprehend the act and the injury. And in many, the defendant had reason to believe the plaintiff remained ignorant he had been wronged. Thus, there is an underlying notion that plaintiffs should not suffer where circumstances prevent them from knowing they have been harmed. And often this is accompanied by the corollary notion that defendants should not be allowed to knowingly profit from [the injured party's] ignorance." (*April Enterprises, Inc. v. KTTV* (1983) 147 Cal.App.3d 805, 831.)

### 3. *Accrual*

City contends "the date of accrual for [plaintiffs'] claims was the day each of them observed discolored water coming from their pipes. This was direct, obvious evidence of their alleged injury." Plaintiffs argue the discolored water was not the injury, "it is the extent of corrosion *inside* the galvanized pipes (latent property damage) from the City's water." Plaintiffs' argument has merit.

50.

City relies on *Lyles*, in which the plaintiffs sued the state for property damage "caused by an inadequate drainage system" that allowed rainstorm water to flood their property. (*Lyles*, *supra*, 153 Cal.App.4th at pp. 284, 285.) Because plaintiffs waited more than three years to file suit, the trial court sustained the state's demurrer and entered judgment in the state's favor. (*Id*. at p. 284.) On appeal, the *Lyles* court rejected the plaintiffs' delayed discovery argument, distinguishing latent damage cases from patent damage cases: "[I]n a patent property damage case, wrongful cause of the damage is inherently possible or suspect enough to require a reasonable, prompt investigation." (*Id.* at p. 288.) "[T]he discovery rule has been applied in property damage cases involving latent defects. [Citations.] … 'In the case of … latent defects the statute of limitations begins to run only when "noticeable damage occurs." ' " (*Ibid*.)

Unlike *Lyles*, this is not a patent property damage case. We agree with plaintiffs that water discoloration is not the alleged injury and did not constitute notice, as a matter of law, to plaintiffs that their plumbing was being damaged. All other things being equal, a lay person experiencing discolored water episodes might reasonably believe the water delivered to it was discolored at its source or in City's water distribution system.

With regard to the majority of plaintiffs, the evidence City proffered in support of its limitations argument was largely limited to the date plaintiffs first saw discolored water come from their taps. The latest of those dates was in 2012. In declarations, these plaintiffs described the water as "discolored, rusty water" or "discolored orange water," and at deposition some plaintiffs used phrases such as "orange-brown rust color," "rust-orange color," or similar phrases to describe the water. Plaintiffs submitted evidence that certain plaintiffs were asked at deposition if they knew their plumbing had been damaged, and the responding plaintiffs denied such knowledge.[21] Several of these plaintiffs were assured by

---

[21]     However, the responses to such questions were not uniform among the plaintiffs. A handful of plaintiffs testified to some awareness that their plumbing was rusting, or was damaged, and, in one case, a plaintiff was told City water was "aggressive" and would "strip the piping … of the minerals." Some of these plaintiffs received assurances from City that

City the water was safe. City's evidence does not demonstrate, as a matter of law, that these plaintiffs were aware their galvanized plumbing had been damaged by City water. And, without notice that their plumbing was damaged, plaintiffs were not required to conduct a reasonable investigation to determine a negligent cause of damage they did not know they suffered.

Notably, this case shares attributes of other cases wherein the delayed discovery rule was applied. The injury or the act causing the injury was difficult to detect because the interior of plaintiffs' galvanized iron-pipe plumbing was hidden from view; City was in a far better position to comprehend the injury and the act or omission that caused it (as a result of its superior knowledge of the NE treatment facility processes and its interim sample water tests); and City appears to have been aware that plaintiffs did not understand why they were receiving discolored water. (See *April Enterprises, Inc. v. KTTV*, *supra*, 147 Cal.App.3d at p. 831.)

City's evidence is undoubtedly relevant to the limitations issue. But it does not allow this court to determine, *as a matter of law*, either a date certain or an approximate date upon which plaintiffs' claims accrued and the statute of limitations began to run.

Noting that "[t]he evidence proffered by City in support of its motion for summary judgment[] … on grounds the claims are time barred includes different evidence specific to each plaintiff," we ordered the parties to brief "whether the motion should be interpreted as seeking summary judgment or summary adjudication of each individual plaintiff's claim in addition to seeking summary judgment or summary adjudication of the cause of action in its entirety." In response, City provided no argument or authority to suggest we should treat the motion as such and, instead, only argued the evidence was sufficient to bar all of plaintiffs and class members' claims. This is tantamount to a concession that City did not intend its motion to be treated as such, and the failure to address the issue upon our

the water was "fine" or "that the City was working on the problem" and each were told by City officials that they should not worry about the problem.

invitation constitutes forfeiture of the issue. (*Behr v. Redmond* (2011) 193 Cal.App.4th 517, 538.) Consequently, we do not consider whether City has established a limitations defense with regard to any individual plaintiff's claim.[22]

Because we have determined the trial court erred in summarily adjudicating plaintiffs' negligence and nuisance claims, we need not consider plaintiffs' remaining arguments in appealing the judgment.

### III. Did the Trial Court Abuse Its Discretion in Granting Plaintiffs' Motion to Certify the Class?

City contends the trial court "erred in finding that common questions of law or fact predominate over individual issues and that the class representatives' claims or defenses are typical of the class." City argues the court "ignored the California Supreme Court precedent establishing 'the [class action] scheme is incompatible with the fundamental maxim that each parcel of land is unique,' " citing *City of San Jose v. Superior Court* (1974) 12 Cal.3d 447, 461 (*San Jose*), and contends the recent case, *Malmquist v. City of Folsom* (2024) 101 Cal.App.5th 1186 (*Malmquist*), based on similar facts, is instructive. City further contends that six of the thirteen plaintiffs have claims that are not typical of the class because they observed discolored water prior to the NE treatment facility coming into operation, and that the court failed to consider how discoloration impacted plaintiffs' use and enjoyment of their homes. Finally, City contends the trial court's statement that " 'use of surface water was the likely cause of the harm to Plaintiffs' pipes' is not based on substantial evidence and rests on improper criteria."

Plaintiffs contend City has failed to address the trial court's reasoning in granting class certification, or has otherwise misrepresented that reasoning, and that the court's "detailed decision … shows that its order is based on an application of the correct law and is

---

[22] Nothing in our opinion should be construed as prejudicing City's ability to bring a motion to summarily adjudicate any individual plaintiff's causes of action assuming, without deciding, that City is otherwise entitled to bring such a motion.

53.

supported by substantial evidence."  Plaintiffs further contend City's reliance on *San Jose* and *Malmquist* is misplaced and those cases do not support reversal of the class certification order.

For reasons discussed below, we affirm the class certification order.

*A.      Class Certification Requirements and Standard of Review*

Authority for class action lawsuits is found in section 382 of the Code of Civil Procedure, which reads, in relevant part:  "[W]hen the question is one of a common or general interest, of many persons, or when the parties are numerous, and it is impracticable to bring them all before the court, one or more may sue or defend for the benefit of all."

Our state Supreme Court has "articulated clear requirements for the certification of a class.  The party advocating class treatment must demonstrate the existence of an ascertainable and sufficiently numerous class, a well-defined community of interest, and substantial benefits from certification that render proceeding as a class superior to the alternatives.  [Citations.]  'In turn, the "community of interest requirement embodies three factors:  (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' "  (*Brinker Restaurant Corp. v. Superior Court* (2012) 53 Cal.4th 1004, 1021 (*Brinker*).)

"On review of a class certification order, an appellate court's inquiry is narrowly circumscribed.  'The decision to certify a class rests squarely within the discretion of the trial court, and we afford that decision great deference on appeal, reversing only for a manifest abuse of discretion:  "Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification."  [Citation.]  A certification order generally will not be disturbed unless (1) it is unsupported by substantial evidence, (2) it rests on improper criteria, or (3) it rests on erroneous legal assumptions.' "  (*Brinker*, *supra*, 53 Cal.4th at p. 1022.)  "We review the trial court's actual reasons for granting or denying certification; if

they are erroneous, we must reverse, whether or not other reasons not relied upon might have supported the ruling." (*Ayala v. Antelope Valley Newspapers, Inc.* (2014) 59 Cal.4th 522, 530.)

### B. Cases Cited by City

In *San Jose*, plaintiffs sued the city on their own behalf and on behalf of all property owners within the flight pattern of the municipal airport, seeking damages for "diminution in the market value of their property" resulting from "aircraft noise, vapor, dust, and vibration." (*San Jose*, *supra*, 12 Cal.3d at pp. 452–453.) The trial court found the action appropriate for class treatment and certified the class. (*Id*. at p. 453.) Our state Supreme Court reversed, explaining that "landing or departure may be a fact common to all, [but] liability can be established only after extensive examination of the circumstances surrounding each party." (*Id*. at p. 461.) The court observed the diverse, potential class would include owners of "industrial plants, public buildings, body shops, warehouses, gas stations, office buildings, multi-unit apartments, single family residences, and vacant land— some being farmed" and that the "region is bisected by a major thoroughfare and bounded by a highway" and included a portion of a "railroad right-of-way." (*Ibid*.) The court wrote: "Development, use, topography, zoning, physical condition, and relative location are among the many important criteria to be considered. No one factor, not even noise level, will be determinative as to all parcels." (*Ibid*.)

The *San Jose* court reaffirmed the rule announced in *Weaver v. Pasadena Tournament of Roses* (1948) 32 Cal.2d 833, 838–840, 842–843) that "a class action cannot be maintained where each member's right to recover depends on facts peculiar to his case" and remarked "the community of interest requirement is not satisfied if every member of the alleged class would be required to litigate numerous and substantial questions determining his individual right to recover following the 'class judgment' determining issues common to the purported class." (*San Jose*, *supra*, 12 Cal.3d at p. 459.) The *San Jose* court rejected the plaintiffs' attempt to avoid the *Weaver* rule by dividing the properties into subclasses

concluding, among other things, "the scheme is incompatible with the fundamental maxim that each parcel of land is unique." (*Id*. at p. 461.)  As a result, City contends *San Jose* stands for the proposition that "class treatment for nuisance and inverse condemnation claims is inappropriate because claims are 'based on defendant's activities that inflict individualized property damage upon unique parcels of property.' "

In *Sav-On Drug Stores, Inc. v. Superior Court* (2004) 34 Cal.4th 319 (*Sav-On*), the high court clarified that class members' claims need not be "uniform or identical."  The *Sav-On* court commented on its holding in *San Jose*.  Noting it had remarked that "the general rule 'that a class action cannot be maintained where each member's right to recover depends on facts peculiar to his case … remains viable in this state," it clarified:  "[R]eading this categorical extract out of context would misstate the established legal standard for commonality, which … is comparative.  Our holding in *San Jose* was, in fact, expressly comparative (see *San Jose*, *supra*, at p. 460 [comparing 'the issues which may be jointly tried' with 'those requiring separate adjudication']), and we consistently have adhered to that approach."  (*Sav-On*, at pp. 338, 339, fn. omitted.)

In our view, *San Jose* did not establish a rule excluding all claims affecting real property from potential class action treatment.  Unlike *San Jose*, here, the subclasses certified by the trial court all involve "residential, single family real property" with galvanized plumbing.  Thus, the diversity of uses prevalent in *San Jose* are absent here and the range of individual issues appear far less than in *San Jose*.  The high court's clarifying statements in *Sav-On* reveal that a core consideration for class certification remains whether common issues predominate over individual issues.

*Malmquist* involved claims similar to those in the case at bar.  There, the plaintiff filed a complaint against the City of Folsom for nuisance, alleging the city "failed to maintain proper corrosion control measures" at its water treatment plant and the corrosive water caused "pinhole leaks damaging [city] residents' properties that are plumbed with copper piping." (*Malmquist*, *supra*, 101 Cal.App.5th at p. 1191.)  The plaintiff proposed a

subclass of " '[a]ll class members who have had a pinhole leak manifest in copper piping.' " (*Ibid*.)  The trial court denied certification after determining the very reports the plaintiff relied upon showed the "pitting and pinhole leaks may be caused by factors other than water composition" and, for the most part, only identified the possibility that water corrosivity was to blame while, at the same time, concluding corrosivity " ' "was … likely a contributing factor to the sudden increase of pinhole leaks throughout the [City's] system." ' " (*Id*. at pp. 1193, 1194, italics omitted.)  Moreover, the author of one of the reports relied upon by the plaintiff "found that, even if pH had been properly controlled, pitting was still likely to have occurred eventually." (*Id*. at pp. 1194–1195.)  In addition, the city produced an expert declaration in which the expert analyzed 12 representative pipe specimens and concluded the damage to those pipes was due to poor workmanship. (*Id*. at p. 1195.)  The Court of Appeal affirmed the trial court's order denying class certification. (*Id*. at p. 1205.)

There are differences between the facts in *Malmquist* and those in the case before us. Here, the reports relied upon by plaintiffs appear to contain a greater level of certainty with regard to the effects of corrosivity on service area residents' galvanized plumbing, stating water discoloration was "most likely" caused by corrosion, as opposed to other factors. And, whereas the very reports relied upon by the *Malmquist* plaintiff appear to contain contradictory conclusions or conclusions that undermined the plaintiff's case.  Here, the parties have not identified any contradictory or undermining conclusions in the reports relied upon by plaintiffs—both of which were prepared prior to litigation. (City did produce, however, post-litigation declarations and expert reports that it contends contradict the reports relied upon by plaintiffs.  We discuss those, *post*.)

More importantly, the fact that a judge, when presented with similar facts, has decided a case differently is not the test for abuse of discretion.  Generally speaking, a discretionary determination will be upheld so long as it is within the bounds of reason even if another judge or court might have ruled differently. (*Bustos v. Global P.E.T., Inc.* (2017)

19 Cal.App.5th 558, 563; *People v. Carmony* (2004) 33 Cal.4th 367, 378; *People v. Lua* (2017) 10 Cal.App.5th 1004, 1020.)

### C. Typicality

City contends "the trial court erred in its typicality analysis." (Bold type and unnecessary capitalization omitted.) City's argument in its opening brief is sparse and consists of a single paragraph. It contends the claims of six of the thirteen plaintiffs "are directly at odds with Plaintiffs' legal theory because they observed discolored water <u>before 2004</u>." City waited until its final reply brief to cite to any evidence in support of the contention, thus denying plaintiffs a fair opportunity to respond. Instead, in its opening brief on its cross-appeal, City cited only to the trial court's ruling on class certification, which reads, in relevant part:

> "The record contains competent evidence supporting findings of typicality. The named plaintiffs are all homeowners of single family residences within the designated area of Northeast Fresno. They all allege that their galvanized pipes were damaged by the City's use of surface water, and that they complained of discolored water to the City but that the City did nothing until 2016, when a large number of homeowners started complaining about the water discoloration. While there may be some minor variations between the claims raised by the different plaintiffs and class members, their claims are generally typical of the claims of the class as a whole. Therefore, this requirement has also been satisfied."

We have reviewed the tardy evidence cited by City and note that it is specific to only two plaintiffs, one of whom testified her first observances of discolored (peach or orange colored) water occurred in 1996, that those episodes were sporadic, that the water would run clear after a few minutes, that it cleared up by 1998 or 1999 and then "kicked back up a couple years later," but that the problem got extremely worse in 2004, at which time the water would not run clear and was an "orange-brown rust color." The other plaintiff to whom the evidence was specific testified she also saw some rust in her water in 2000 or perhaps earlier.

The trial court's characterization of these variations as "minor" is apt and the court's typicality analysis does not warrant a reversal of the class certification order.

### D. Predominance

"The 'ultimate question' the element of predominance presents is whether 'the issues which may be jointly tried, when compared with those requiring separate adjudication, are so numerous or substantial that the maintenance of a class action would be advantageous to the judicial process and to the litigants.' " (*Brinker*, *supra*, 53 Cal.4th at p. 1021.)  " 'As a general rule if the defendant's liability can be determined by facts common to all members of the class, a class will be certified even if the members must individually prove their damages.' " (*Id*. at p. 1022.)  "However, … class treatment is not appropriate 'if every member of the alleged class would be required to litigate numerous and substantial questions determining his individual right to recover following the "class judgment" ' on common issues." (*Duran v. U.S. Bank National Assn*. (2014) 59 Cal.4th 1, 28.)  "Predominance is a factual question; accordingly, the trial court's finding that common issues predominate generally is reviewed for substantial evidence.  [Citation.]  We must '[p]resum[e] in favor of the certification order … the existence of every fact the trial court could reasonably deduce from the record….' " (*Brinker*, *supra*, 53 Cal.4th at p. 1022.)

In its class certification ruling, the trial court made the following comment in discussing the commonality of class member claims:  "[T]he City's own investigation concluded that use of surface water was the likely cause of the harm to plaintiffs' pipes."  City contends this conclusion is not supported by the pages of the preliminary 2016 WQTS report cited by the court.  We disagree.

The executive summary of the 2016 WQTS report reads, in part:  "In 2004, the City brought online the [NE treatment facility] ….  Since the introduction of the treated [NE treatment facility] water into the distribution system, the City has received increased customer reports about water discoloration …."  "Analysis of the data and information gathered by the City suggests that the increase in discolored water incidents was *most likely*

*caused* by the corrosion of galvanized iron pipes used either as service laterals (between the water meter and the home) or in indoor plumbing.  Galvanized pipes are supposed to have a zinc coating that covers and protects the underlying mild steel.  However, in many of the impacted homes, the zinc layer appears to have completely corroded exposing the mild steel to the water, which then continued to corrode and release iron into the water." (Italics added.)  The trial court's statement is supported by the text of the report.

City also contends the 2016 WQTS "report did not evaluate data from [plaintiffs'] homes or pipes."  City does not explain how it arrived at this conclusion.  We have reviewed deposition testimony in the record on appeal from each of the plaintiffs (or their plaintiff spouse) that shows City tested water at each of their residences in the relevant time frame.  Moreover, the 2016 WQTS report states in the very first paragraph of its executive summary that City collected "water samples from various taps in approximately 247 homes … within the City's water service area" and "City also collected and analyzed a number of corroded pipes from impacted homes."  The report states it analyzed "data and information gathered by the City," and it is fair to infer that this report considered the City's data and analysis of water samples and corroded pipes it collected.

City also argues "the trial court ignored later scientific reports that cast significant doubt on a causal connection between City-supplied water and the alleged damages to [plaintiffs'] pipes"—a 2018 article whose authors included City's Director of Public Utilities (DPU) and other DPU employees, a 2018 engineering report for consideration of a water supply permit amendment, and a 2019 WQTS report it claims "disproved" the 2016 WQTS report.[23]  While it may be argued that some of the pages contain information

---

[23]  The 2019 WQTS report was prepared in connection with City's plan to bring online a different surface water treatment plant to service the southern area of City's water distribution system.  Specifically, "the City retained the services of WQTS to design, assist in the fabrication and installation of, and oversee the operation of a nine-rack pipe-loop setup (pilot) where multiple water treatment alternatives could be tested."  "The primary objective of this pilot study was to identify an optimized chemical treatment strategy that would eliminate or significantly reduce the potential for discolored water conditions when

60.

supportive of City's defenses, some contain information arguably supportive of plaintiffs' claims.[24]  To the extent these reports, which were prepared subsequent to the filing of plaintiffs' lawsuit, contain evidence that supports or contradicts the findings of the 2016 WQTS report, it would seem that such evidence might well be appropriate for presentation in a trial involving common issues.  (See *Knapp v. AT&T Wireless Services, Inc.* (2011) 195 Cal.App.4th 932, 941 [information relevant to a defendant's defenses may also present common issues of law or fact].)  There is no evidence that the trial court ignored these reports and, in fact, the court acknowledged City's contention that the 2019 WQTS report "disproved" the 2016 WQTS report.  It commented, "the fact that there are inconsistencies in the two reports does not preclude certification.  'The certification question is "essentially a procedural one that does not ask whether an action is legally or factually meritorious," ' " citing *Sav-On*, *supra*, 34 Cal.4th at page 326.

City argues its "experts opined there are numerous causes and conditions that cause discolored water and corrosion unrelated to City water."  City cites to several pages of a declaration of its expert, Dr. Steven J. Duranceau, and to a single page from the declaration of its expert, Ed Hernandez, P.E., without further discussion.  In a subsequent paragraph, City cites to the same pages of Dr. Duranceau's declaration for the proposition that

the [new plant] was placed into service in the summer of 2018."  Although the study underlying the 2019 WQTS report was performed in response to the issues City had experienced in the operation of the NE treatment facility, the report was primarily forward looking.  It may well contain information relevant to plaintiffs' claims or City's defenses, but the purpose of the study was not, as far as we can tell, to identify the cause of plaintiffs' complaints but rather to avoid similar problems in the future.

[24]  For example, the report prepared in support of City's application for a 2018 water supply permit amendment states that the results of City's 2016 investigation "showed the presence of lead in some potable fixtures, but mostly non-potable use fixtures [e.g., utility sinks or hose bibs], above the lead action level" and "of the 1,404 homes monitored for lead levels, a total of 299 homes are currently believed to have lead above the action level" and "represented a small percentage of homes in northeast Fresno."  It further states the investigation "resulted in changes in the City's corrosion control program" at the NE treatment facility and "corrosion treatment has been optimized based on the reduced number of customer discoloration complaints and reduced lead levels after about six to nine months.

"[d]etermining liability would involve questions of workmanship and the quality of the piping, among other inherently individual inquiries." City contends the trial court disregarded this evidence.[25] We disagree. In its class certification ruling, the court wrote:

> "While the City contends that the proposed class members' homes will each have different types of piping, different plumbing designs, and that other factors may have caused the discoloration in their water, these issues do not appear to be enough to show that the proposed class does not allege a common set of claims based on similar facts and similar alleged harm. All of the class members were allegedly subjected to the same kind of harm from the same source, namely the City's use of surface water which allegedly damaged their galvanized pipes. The City has also raised the same defenses to plaintiffs' claims, many of which can presumably be resolved on a class-wide basis. If the class is not certified, the proposed class members would have to bring their claims individually, which could be impractical and burdensome, as each individual case would presumably cost more to litigate tha[n] each plaintiff would recover in damages."

City contends the trial court erred in concluding "causality could be determined on a group basis" and "failed to consider whether several elements of causes of action could be determined on a group basis." With respect to plaintiffs' private nuisance claims, City argues that whether a condition it caused interfered with plaintiffs' use and enjoyment of their property is not susceptible of common proof. According to City, the factors that will vary amongst individuals include, without limitation, the "frequency of occurrence of discolored water, its duration, its degree, and the number and types of faucets." Conceivably, these differences may impact the amount of damages a plaintiff or class member may be entitled to in the event they succeed on the claim. But the fact that members will be required to " 'individually prove their damages' " will not preclude class certification. (*Brinker*, *supra*, 53 Cal.4th at p. 1022.)

---

[25] City again waited until its final reply brief to itemize, cite to, and elaborate on the "other inherently individual inquiries" it alluded to in its opening brief. In doing so, it has denied plaintiffs a fair opportunity to meet and address the evidence and breadth of City's expanded argument. Notwithstanding, we have reviewed the evidence and are not persuaded by it that the certification order should be reversed.

*E.*     *Commonality*

Undoubtedly, there are common questions of fact or law that are presented by the current lawsuit. With regard to the law, common questions are plentiful and include, without limitation, the statutory and regulatory framework of the state SDWA and federal SDWA, and the substantive statutory law and case law concerning negligence and nuisance.

Similarly, there are common questions of fact. They include, without limitation, questions involving (1) historical facts surrounding the construction, purpose, function, and service area of the NE treatment facility; (2) the engineering consultants' reports that were obtained by City in advance of the facility coming online and the opinion, conclusions and recommendations contained therein; (3) the investigation and investigative report(s) of City consultants in investigating the discolored water complaints; (4) the communications between residents and City; (5) the admissions and denials of City officials pertaining to the subject of the lawsuit; (6) the engineering consultants' reports that were obtained by City in advance of it bringing online a new surface water treatment facility to service residents in southern Fresno; (7) expert testimony concerning water chemistry, chemical reactions between different types of water and galvanized pipes, and the variables that might impact those chemical reactions; (8) City's compliance (or non-compliance) with its water supply permit; and (9) City's compliance (or non-compliance) with its reporting and notification duties under the state SDWA.

Many of the above issues are highly technical and both the litigants and the court would benefit from efficiencies that would result from a single class action proceeding wherein these issues are considered. And, to the extent City has information that may contradict, disprove, or clarify earlier City consultant reports, findings, and recommendations, we have not been presented with any compelling reason why these issues

are not sufficiently common to the issues presented by plaintiffs' claims or why they should preclude certification.[26]

On the other hand, City has raised several questions of fact that it contends present individual inquiries. Dr. Duranceau has opined as to the following variables that might cause corrosion or affect water quality: (1) temperature; (2) poor workmanship and poor plumbing materials; (3) dissimilar metals coming into contact; (4) water velocity; (5) use of poorly maintained water heaters; (6) stray electrical currents emanating from lightening or electrical grid infrastructure; (7) water age; and (8) seismic activity. The prevalence of these conditions in plaintiffs and class members' residences is largely uncertain and the evidence cited by City does not resolve that uncertainty.[27]

Based on the record before us, we are not able to say that the trial court abused its discretion in determining that common questions of fact or law predominate.

## DISPOSITION

The judgment entered in favor of City and against plaintiffs is reversed. We direct the trial court to vacate its order granting City's motion for summary judgment and to enter

---

[26] City states, for the first time in its reply brief, that one of plaintiffs' experts testified that, if a homeowner is only experiencing water quality issues in one or a few locations as opposed to throughout the entire home, that "it would not be necessary to repipe the entire home." " 'Points raised for the first time in a reply brief will ordinarily not be considered ….' " (*Reichardt v. Hoffman* (1997) 52 Cal.App.4th 754, 764.) Accordingly, we deem the point forfeited. Moreover, the point appears to go to damages and will not preclude certification. (*Brinker, supra,* 53 Cal.4th at p. 1022.)

[27] Nothing in this opinion should be construed as barring the trial court from making additional orders pertaining to certification—including, without limitation, an order decertifying the class should the court deem it appropriate. " 'It may be, of course, that the trial court will determine in subsequent proceedings that some of the matters bearing on the right to recovery require separate proof by each class member. If this should occur, the applicable rule … is that the maintenance of the suit as a class action is not precluded so long as the issues which may be jointly tried, when compared to those requiring separate adjudication, justify the maintenance of the suit as a class action.' [Citations.] And if unanticipated or unmanageable individual issues do arise, the trial court retains the option of decertification." (*Sav-On, supra,* 34 Cal.4th at p. 335.)

a new order granting summary adjudication of the causes of action for breach of contract and breach of implied warranty, and denying the remainder of the motion.

In addition, we reverse the court's order sustaining City's demurrer to plaintiffs' inverse condemnation claim without leave to amend, and direct the trial court to enter a new order sustaining the demurrer with leave to amend consistent with this opinion.

We affirm the trial court's class certification order.

Plaintiffs are entitled to their costs on appeal.


                                                    DE SANTOS, J.

WE CONCUR:


DETJEN, Acting P. J.


PEÑA, J.